KENEDY PASTURE COMPANY ET AL. v. STATE OF TEXAS ET AL.

No. 3043.    Decided May 18, 1921.

(231 S. W., 683.)

1.—Jurisdiction of Supreme Court—Boundary Case.

The judgment of the Court of Civil Appeals in matters of boundary being final, it will not be reviewed by the Supreme Court in determining questions of limitation which were dependent wholly on the determination of such boundary.   (Pp. 222, 223).

2.—Same—Question not Dependent on Boundary.

Where the right of the whole case is not dependent on the decision on boundary, as where it involves also the validity of a grant of land from the Sovereignty, independent of the boundary question, the Supreme Court may have jurisdiction to review the ruling thereon. In so doing it will accept the ruling of the lower court on boundaries as final; though if a determination of the boundary question were necessary to its decision of the question as to title, it would have power, incidentally, to determine that also. (West Lumb. Co. v. Goodrich, 223 S. W., 183, approved, but distinguished.)   (P. 223).

3.—Jurisdiction of Supreme Court—Questions of Fact—Boundary and Limitation.

Findings of fact by the Court of Civil Appeals on questions of boundary and limitation, where there is evidence to support them, must be accepted by the Supreme Court.   (Pp. 223, 224).

4.—Mexican Grant—Sovereignty—Texas and Tamaulipas.

A grant of land between the Rio Grande and Nueces rivers, and within the limits of Texas as recognized by the treaty of Guadalupe Hidalgo, but once a part of the Mexican State of Tamaulipas, made by the Governor of that State in 1848, more than two months after the conclusion of such treaty, was void and conveyed no title to the grantee, the sovereignty over the soil being then in Texas, and not in Mexico or Tamaulipas. (Pp. 224-230).

5.—Same—Treaty.

The signing of a treaty recognizing the sovereignty of Texas and the United States as extending to the Rio Grande river concluded any right in the Mexican State of Tamaulipas to exercise such sovereignty by granting lands within such limits from that date. Any *de facto* possession or exercise of authority by Tamaulipas thereafter in such territory must be considered to be merely for municipal purposes, for the preservation of order and the adjustment of private rights, and not involving the sovereign power to grant lands. This is true of grants made between the signing of the treaty and the exchange of ratifications and its formal proclamation. (Pp. 226, 227).

6.—Same—Historical Review.

The history of the assertion of sovereignty by the Republic and by the State of Texas over territory extending to the Rio Grande river, from 1836 to 1848, is here reviewed. (Pp. 224-226).

7.—Treaty—Equitable Rights of Mexican Citizens.

The treaty of Guadalupe Hidalgo protected rights of Mexican citizens who by survey and payment had acquired an equitable right to receive grant of land from a State of Mexico before that time, but had not received grant of legal title. See evidence *held* to support a finding in favor of such right. (Pp. 230, 231).

8.—Same—Notice—Innocent Purchaser.

The mere equitable right of a citizen to receive a grant of land from the State of Tamaulipas within limits recognized by treaty as henceforth within the sovereignty of Texas, but not supported by any record evidence of such right, could not prevail over the right of an innocent purchaser from the State of Texas having no notice of such equity. (Pp. 230-233).

9.—Equitable Title—Abandonment.

Mere failure to assert his inchoate right to receive a grant would not operate as a forfeiture or abandonment of it. Where abandonment was, under the state of the proof, a question of fact, the finding against such abandonment by the lower court concludes that issue in the Supreme Court. (P. 231).

10.—Innocent Purchaser—Notice.

Actual or record notice of the claim of a Mexican citizen to land in Texas which led on examination only to a grant wholly void because made by a Governor of Tamaulipas after the land had passed under the sovereignty of Texas, did not prevent one subsequently acquiring title by grant from Texas being held to be an innocent purchaser as to any merely equitable right of the Mexican citizen to receive such grant, acquired while the sovereignty of Tamaulipas still existed. (Pp. 231-233).

11.—Innocent Purchaser—Payment—Equity.

Buyers of school land from the State were entitled to protection as innocent purchasers, as against a previous inchoate equitable right of another to receive a grant of the land from the Mexican Government, though they had not completed the payment of their annual instalments of purchase money, where they had completed their settlement thereon, the principal

consideration for the sale, and had made valuable improvements, and where no offer to requite them therefor was made by the claimant of the equitable right. (P. 232).

### 12.—Constitution—Titled Land.

Where the only record evidence of any claim to the title to land, in the Land Office or elsewhere, was referable to a grant by the Mexican Government which was void upon its face, being made after that Government had lost its rights as sovereign, this did not constitute it "titled land" or "land equitably owned," within the contemplation of Section 2, Article 14, of the Constitution. (P. 233).

### 13.—Cases Discussed, Followed, etc.

Haynes v. State, 100 Texas, 426; State v. Gallardo, 106 Texas, 274; State v. Bustamente, 47 Texas, 320; State v. Sais, 47 Texas, 307; Trevino v. Fernandez, 13 Texas, 664; discussed and followed. Clark v. Hills, 67 Texas, 141; Texas-Mex. Ry. Co. v. Locke, 74 Texas, 370; discussed and distinguished. (Pp. 227-231).

### 14.—Evidence.

Where there is evidence of the genuineness of documents in the archives of a foreign country their contents may be proved by a compared copy. (P. 230).

Error to the Court of Civil Appeals for the Third District in an appeal from Travis County.

The suit was brought by the State of Texas for the recovery of land claimed to belong to the public free school fund. Numerous parties were named as defendants, and others became parties by intervention. With this action by the State were consolidated three suits concerning the land between other parties and brought in Cameron and Willacy counties. From a judgment disposing of the rights of all the various claimants the Kenedy Pasture Co. and more than one hundred other parties appealed, and on affirmance (196 S. W., 287) obtained writ of error.

*G. B. Scott, Boone & Pope, James B. Wells, Ike D. White, E. Cartledge,* and *Harbert Davenport,* for plaintiffs in error.

Under the law and the undisputed facts in evidence in this case, at the time of the issuance of said title by the said Governor of Tamaulipas, he, as such Governor of Tamaulipas, had full power and lawful right to then issue said title or grant. United States v. Reynes, 9 Howard (U. S.) 127; Haver v. Yaker, 9 Wall, 32, 33, (76 U. S., 571) ; Coffee v. Groover, 123 U.S., 1, et seq.; Poole v. Lessee of Fleeger, 11 Peters (U. S.) 185, et seq.

Judge Roberts' dicta, in *State v. Bustamente,* is, the sole basis for the conclusion of the Court of Civil Appeals that the grant issued in 1848 is void. But the language of the Bustamente case is explained by Judge Roberts in the opinion in *State v. Sais,* decided at the same time. It is clear from the two opinions that Judge Roberts' impression that grants issued by the Governor of Tamaulipas in 1848 to lands north of the Rio Grande were void, was based solely upon the

theory that the occupation of that territory by the armed forces of the United States, in 1846, terminated the jurisdiction and power of the State of Tamaulipas to dispose of its domain north of the Rio Grande, and gave effect to the paper claim asserted to said territory by Texas.

On the contrary, Chief Justice Willie, in *Clark v. Hills,* affirmatively decided, with reference to the territory in the former Mexican State of Chihuahua, situated with reference to the claim of the State of Texas exactly as is the territory formerly in the State of Tamaulipas involved in this suit, that the jurisdiction of Mexico over said territory and the title of the State of Chihuahua thereto did not pass until said territory was ceded by Mexico by the terms of the treaty of Guadalupe Hidalgo, in 1848, and that the mere paper claim of jurisdiction by the Legislature of Texas to the territory of said Mexican States, by Act of December 19, 1836, was not of sufficient importance to deserve consideration; and Chief Justice Stayton, in the very able and exhaustive opinion in *Texas-Mexican Railway Co. v. Locke,* 74 Texas, 400, definitely fixed July 4, 1848, when the treaty of Guadalupe Hidalgo was proclaimed, as the date to which lands titled to Mexicans, within the boundaries of the former Mexican State of Coahuila, ceded to the United States by said treaty of Guadalupe Hidalgo, would be protected as valid titles.

The Treaty of Guadalupe Hidalgo, made pursuant to the Constitution of the United States of America, and therefore the supreme law of the land, expressly guaranteed that property of every kind in the territories ceded by Mexico to the United States, belonging to Mexicans, by the terms of said treaty, should be inviolably respected, and that Mexicans who might thereafter acquire said property by contract, should enjoy, with respect thereto, guaranties equally ample with those enjoyed by citizens of the United States. Hamilton v. Avery, 20 Texas, 635; Sherwood v. Fleming, 25 Texas Supp., 428; Tex. Mex. Ry. Co. v. Locke, 74 Texas, 370; Haynes v. State, 100 Texas, 426; Bryan v. Kennett, 113 U. S., 179, et seq.; Mitchel v. United States, 9 Peters, 734; United States v. Percheman, 7 Pet., 51, 86; United States v. Arredondo, 6 Pet., 712; Strother v. Lucas, 12 Pet., 436; Delassus v. United States, 9 Pet., 133; Soulard's Heirs v. United States, 4 Pet., 511, 10 Pet., 100-106; Hornsby v. United States, 10 Wall., 242; Smith v. United States, 10 Pet., 330; United States v. Clarke, 8 Pet., 444, 445; United States v. Moreno, 1 Wall., 404; Jones v. McMasters, 20 How., 8, et seq.; Langdeau v. Hanes, 21 Wall., 527; Airhart v. Massieu, 98 U. S., 496; Carpenter v. Rannels, 19 Wall., 141; United States v. Chavez, 175 U. S., 521, 522; United States v. Fremont, 17 How., 557; United States v. Perot, 98 U. S., 428; United States v. Ritchie, 17 How., 525; Henderson v. Poindexter's Lessee, 12 Wheat., 535; People v. Folsom, 5. Calif., 373; Ferris v. Coover, 10 Calif., 618; Leese v. Clark, 20 Calif., 388.

Article XIV, · Section 2, of the Constitution of Texas, expressly provides that land certificates shall be located, surveyed and patented only upon vacant and unappropriated public domains, and not upon any land titled or equitably owned under color of title from sovereignty, evidence of the appropriation of which is on the county records or in the General Land Office, or when the appropriation is evidenced by occupation of the owner or some person holding for him; and the location of a land certificate, the issuance of a patent by the State of Texas, or the making of a contract of sale by the State of Texas, of lands which had been granted by the State of Tamaulipas, Republic of Mexico, prior to the treaty of Guadalupe Hidalgo, is absolutely void, and in violation of both the terms of said treaty and of the provisions of Article XIV, Section 2, of the Constitution of the State of Texas, and does not vest in any person locating such certificates, acquiring such patents or purchasing said lands from the State of Texas, either "junior title" or "color of title," and cannot be made the basis of any right or claim to said lands, of any kind or character whatsoever. Treaty of Guadalupe Hidalgo, Articles I-VIII; Constitution of Texas Article XIV, Section 2; State v. Sais, 47 Texas, 316, 317; Texas Mexican Ry. Co. v. Locke, 74 Texas, 370; Clark v. Hills, 67 Texas, 141; Winsor v. O'Connor, 69 Texas, 571; Texas Mexican Ry. Co. v. Jarvis, 69 Texas, 527; Von Rosenberg v. Haynes, 85 Texas, 357; Texas Mexican Ry. Co. v. Uribe, 85 Texas, 386; Downing v. Diaz, 80 Texas, 436; Gonzales v. Ross, 120 U. S., 605; Lerma v. Stevenson, 40 Fed., 356; Jackson v. Clark, 1 Peters (U. S.) 638; Niswanger v. Saunders, 1 Wall. (U. S.) 438; McArthur v. Dun, 7 Howard (U. S.) 270.

Both the trial court and the Court of Civil Appeals having found as facts that the grants from the State of Tamaulipas, Mexico, to Yrenio Gomez of Las Barrosas Grant and to Juan Antonio Balli of the El Paistle Grant, were valid grants as originally made and surveyed by and under the Mexican Government, and were also both confirmed by Act of the Legislature of the State of · Texas, approved . February 10th 1852, the judgments of said courts, taking from the Kenedy Pasture Company and the "Mexican Defendants" parts of said three grants and adjudging parts of such grants as originally surveyed and acquired by the original grantees, to the "Purchasers from the State" who claim only from, through or under the State of Texas (And thus giving the State of Texas the benefit of such recovery) is not only a taking of private property for public use and benefit without adequate compensation therefor, but also directly impairs the contract between the State of Tamaulipas and the original grantees of said Las Barrosas, El Paistle and Santa Rosa de Abajo whole grants of land, and is also the taking of such property without due process of law. Authorities previously cited. Also, Const. of Texas, 1876, Art., 1 Sec. 16; Art. 1, Sec. 17; Const. of U. S., Art. 1,

Sec. 10; Const. of U. S., 14th Amendment; Blanford v. U. S., 10 Texas Civ. App., 627; United States v. Rauscher, 119 U. S., 407; Osborne v. Barnett, 1 App. C. C., sec. 129.

Since, under the findings of the Court of Civil Appeals and the trial court, the State of Texas had absolutely no title to said 20 sections of unpatented State school lands, and since, under the findings of the Court of Civil Appeals and the trial court, said unpatented State school sections were surveyed entirely within the boundaries of said Santa Rosa de Abajo, El Paistle and Las Barrosas Grants, the pretended sales of said land by the State of Texas to said purchasers was a mere nullity and of no force or effect whatsoever, and no plea of the doctrine of innocent purchaser can be predicated thereon. Art. 3695, Revised Civil Statutes of Texas; Lambert v. Weir, 27 Texas, 365; Kimbro v. Hamilton, 28 Texas, 567; Charle v. Saffold, 13 Texas, 94; Dangerfield v. Paschal, 11 Texas, 579; Chinn v. Taylor, 64 Texas, 389; Pillow v. Roberts, 13 Howard, (U. S.) 472.

A contract for the sale of real estate, made and entered into by a pretended vendor who has no ownership or title in or to the lands affected by said contract, is a mere nullity, not binding upon either party to said contract, and cannot be made by the vendee in said contract, the basis upon which to predicate a claim of innocent purchase of said lands. Tinsley v. Dowell, 87 Texas, 23.

Locations of certificates upon lands "titled or equitably owned under color of title from the sovereignty of the State, evidence of the appropriation of which is on the County Records, or in the General Land Office," being inhibited under Article 2, Section 14, of the Constitution of the State of Texas, the Court of Civil Appeals having found that the lands of the Santa Rosa de Abajo were equitably owned by the heirs of Pedro Villareal prior to the location and surveys under certificates, and the evidence being undisputed that there was evidence of the appropriation of said lands on the County Records, and in the General Land Office, prior to the location of such certificates and surveys thereunder, neither Parker, the Fant Heirs or those claiming under them, nor "Purchasers·from the State," were innocent purchasers for value without.notice.

The evidence being undisputed that El Paistle and Barrosas Grants were confirmed by the Act of the Legislature on February 10th, 1852, and were owned and held by Kenedy Pasture Company, and that Kenedy Pasture Company, for more than thirty years had been in possession of the lands of said grant, asserting and claiming title to all of said lands within the boundaries of the original surveys thereof, made in 1832, for the original grantees thereof, and so confirmed, and had same enclosed and rendered and paid taxes thereon and that " Fant Heirs" and those under whom they hold and claim, have acquiesced for over thirty years in the boundaries, lines and enclosures by pasture fences by said Kenedy Pasture Company of the El Paistle

and Las Barrosas Grants, as so originally surveyed, and that "Fant Heirs," and "Purchasers from the State," claimed only by virtue of location of certificates thereon and surveys made thereunder, said "Fant Heirs," and "Purchasers from the State," were not innocent purchasers for value without notice, as to said part and portion of said lands adjudged to them respectively, which lie upon the lands within the lines and boundaries of El Paistle and Las Barrosas Grants, as originally surveyed and granted. Guilbeau v. Mays, 15 Texas, 417; Airhart v. Massieu, 98 U. S., 496; Rogers v. Mexia, 36 S. W., 828; Murchison v. Mexia, 36 S. W., 829, 830; Winsor v. O'Connor, 69 Texas, 571, 8 S. W., 519; O'Connor v. Vineyard, 43 S. W., 60; Moore v. Scott, 38 S. W., 395; Williams v. Rand, 30 S. W., 512; Gilbert v. Mansfield, 85 S. W., 830; Mansfield v. Gilbert, 86 S. W., 922; T. & N. O. v. Barber, 71 S. W., 393; Massey v. G. H. & S. A. 27 S. W., 208; John v. Battle, 58 Texas, 596; Creswell Ranche & Cattle Co. v. Waldstein, 28 S. W., 262; Wright v. Nelson, 46 S. W., 262; Besson v. Richards, 58 S. W., 614; Jackson v. Waldstein, 27 S. W., 26; Day Land & Cattle Co. v. State, 86 Texas, 526, 4 S. W.., 876; Sherwood v. Fleming, 25 Texas, Supp., 409; Wyllie v. Wynne, 26 Texas, 43; McWhirter v. Allen, 20 S. W., 1008; Peters v. Clements, 46 Texas, 114; Renick v. Dawson, 55 Texas, 102; Hamman v. Keigwin, 39 Texas, 34; Hawley v. Bullock, 29 Texas, 223; Moody v. Ogden, 72 S. W., 255; Turner v. Cochran, 94 Texas, 484; Watkins v. Edwards, 23 Texas, 447; Bryan v. Crump, 55 Texas, 1; Railway Co. v. McGehee, 49 Texas, 481; Gammage v. Powell, 61 Texas, 629; Decourt v. Sproul, 66 Texas, 368; Cook v. Burnly, 78 U. S., 31; 11 Wall., 670; 20 L. Ed., 29; 2 Pom. Eq. Sec. 595-597; Sec. 2, Art. XIV, State Constitution 1876.

The judgment in favor of the "Purchasers from the State" is in effect a judgment that the State of Texas had title thereto against plaintiffs in error, and was entitled to recover all said sections so adjudged to said purchasers from the State, and that such purchasers from the State could and would acquire the State's title thereto upon compliance with the terms of their contract to purchase. Durst v. Daugherty, 81 Texas, 650, 654; Sparks v. Taylor, 99 Texas, 411, 427; Johnson v. Newman, 43 Texas, 628; Fraim v. Frederick, 32 Texas, 294; Campbell v. Sidwell, 53 N. E., 609, 610; 1 Pom. Eq., Sec. 413, 415; 2 Pom. Eq., Sec. 718 and 750.

The Court of Civil Appeals erred in holding and in finding that the evidence is sufficient to sustain the findings of the trial court on the issues of limitation. On Sufficiency and Character of Adverse Possession: Vineyard v. Brundrett, 42 S. W., 234; Polk v. Beaumont Pasture Co., 64 S. W., 61; De la Fuentes v. McDonald, 85 Texas, 136; Turner v. Moore, 81 Texas, 206; Bender v. Brooks, 127 S. W., 170; Shaw v. Windham, 155 S. W., 636; Warren v. Fredericks, 18 S. W., 750; Waller v. Leonard, 89 Texas, 508; Bruce v. Washington, 80 Texas, 368; On Fant's Statement: Shaw v. Windham, 155 S. W., 636;

Waller v. Leonard, 89 Texas, 508; Hand v. Swann, 21 S. W., 283. On Description and Deeds: R. S. 1911, Art. 5674; Sheppard v. Avery, 28 T. C. A., 479; Cook v. Oliver, 83 Texas, 560; Clark v. Kirby, 25 S. W., 1096. On sufficiency of Proof as to Payment of Taxes: R. S. 1911, Art. 2316; Murphy v. Welder, 58 Texas, 235; Acklin v. Paschal, 48 Texas, 147. Locations on "Lands Titled or Equitably Owned;" Sec. 2, Art. XIV, Const. 1876; Winsor v. O'Connor, 69 Texas, 579; Gilbert v. Mansfield, 85 S. W., 832; Beeson v. Richards, 58 S. W., 614; Gilbert v Harris, 109 S. W., 393; Williamson v. Brown, 109 S. W., 412; Keith v. Guedry, 114 S. W., 392; Johnson v. Knippa, 127 S. W., 905; Texas Land & Mortgage Co. v. State, 23 S. W., 259; Railway v. Locke, 74 Texas, 370; Sheppard v Avery, 69 S. W., 83; Mills v. Needham, 67 S. W., 1097; Cameron's Executors v. State, 67 S. W., 354; Noble v. Railroad, 147 U. S., 174; Clark v. Smith, 59 Texas, 279. On effect of Treaty: State v. Sais, 47 Texas, 307; State v. Bustamente, 47 Texas, 321; Haynes v. State, 100 Texas, 430; State v. Russell, 85 S. W., 290; State v. Gallardo, 166 S. W., 369.

The Court of Civil Appeals erred in holding, in effect, that the true location of boundary of said Abajo, El Paistle and Las Barrosas Grants, as originally surveyed and granted by the Mexican Government, is as claimed by the defendants in error, the State of Texas and others, and not as claimed by plaintiffs in error herein, Kenedy Pasture Company and others. Cox v. Finks, 91 Texas, 318; Schley v. Blum, 85 Texas, 551; Mansfield v. Gilbert, 86 S. W., 922.

"Fant Heirs," and those under whom they hold, have for more than thirty years recognized and acquiesced in the western boundary line of the El Paistle Grant, and the most eastern west boundary line of the Las Barrosas, and the most southern north boundary line of the Las Barrosas Grant, as claimed and contended by plaintiff in error Kenedy Pasture Company herein, as the true western boundary line of said El Paistle Grant, and the true most eastern west line of Las Barrosas Grant, and the true most southern north boundary line of said Las Barrosas Grant, and are therefor bound by said lines under the doctrine of recognition and acquiescence. Lagow v. Glover, 77 Texas, 451; Medlin v. Wilkins, 60 Texas, 413; Browning v. Atkinson, 46 Texas, 604; Floyd v. Rice, 28 Texas, 343; 2 Pom. Eq. Jur., Sec. 965.

The Court of Civil Appeals and the trial court erred in holding that should it be held under the facts that El Paistle and Las Barrosas Grants, as originally surveyed and granted, were located as contended for by plaintiff in error Kenedy Pasture Company, still said company, under the facts of this case, is estopped from asserting that said surveys included any lands other than those described in the patents of said grants by the State of Texas. Corrigan v. State, 94 S. W., 95; Sullivan v. State, 96 S. W., 645; State v. Palacios, 150 S. W., 229, 239; Clark v. Hills, 67 Texas, 145; Love v. Barber, 17 Texas, 312.

The Court of Civil Appeals erred in holding that the evidence was sufficient to sustain the finding of the Trial Court that Plaintiff in error Kenedy Pasture Company had not acquired title under either the three, five or ten years' statutes of limitation to that portion of the Santa Rosa de Abajo survey included within its fences. Article 5672, 5674, 5675, Revised Statutes, 1911; Brown v. O'Brien, 33 S. W., 268; Dunn (Tackaberry, Intervener) v. Taylor, 102 Texas, 80; Peyton v. Barton, 53 Texas, 303.

*B. F. Looney*, Attorney-General, and *G. B. Smedley*, assistant, for State.

Plaintiffs in error's first assignment undertakes to argue that the title issued by the governor of Tamaulipas on April 12, 1848, was valid on the theory that it was issued before the exchange of ratifications of the Treaty of Guadalupe Hidalgo. This treaty was concluded February 2, 1848, ratified by the United States Senate March 10, 1848, ratified by the president of the United States March 16, 1848, and ratifications were exchanged May 30, 1848. See Fed. Ann. Stat., page 694.

In the first place, this remarkable contention is contrary to the well established rule that as between the contracting parties a treaty takes effect from the time it is signed, and its subsequent ratification relates back to that date, so as to render the provisions applicable to acts done by the contracting parties between the dates of signing and ratification. See Volume 39, Cyc., p. 972. There is an exception to this general rule, that as to rights between individuals a treaty does not take effect until ratification. This arises out of the question of notice, but the exercising of the sovereign power to grant land is not a matter of contract between individuals and is something more than individual rights. The granting of land is one of the most important of the acts of the sovereign.

But aside from what has been said in the preceding paragraph, the contention made under this assignment is in the face of all of the decisions of our Supreme Court, which are to the effect that after the territory between the Rio Grande and the Nueces was occupied by the army of the United States in 1846, the State of Tamaulipas lost all sovereignty over the territory and that a grant of land attempted to be made by an officer of the State of Tamaulipas after that time in such territory was wholly void. That this is true is fully sustained by the very recent opinion of the court in the case of State v. Gallardo, 106 Texas, 274; Haynes v. State, 100 Texas, 426; State v. Bustamente, 47 Texas, 320.

The contention made under this assignment overlooks the fact that the land between the Nueces and the Rio Grande Rivers has never been the property of the United States. Constructive jurisdiction of the Republic of Texas was acquired over this land on

December 19th, 1836. Actual jurisdiction of Texas, not of the United States, was acquired and made complete by the occupation of the territory by the United States army in 1846, Texas having been annexed to the United States in 1845. As said by this court in the Gallardo case, the sovereignty of Texas over this territory was an accomplished fact in 1846 and at that time Tamaulipas had lost not only constructive sovereignty but also actual sovereignty over this land and the title issued by the Governor of Tamaulipas in 1848 was necessarily void. This land never passed to the United States. It did not pass to Texas under or by virtue of the Treaty of Guadalupe Hidalgo. It had already been acquired by Texas two years before that treaty was concluded.

There is no need to cite authorities to this court that persons who have bought school land on condition of settlement are purchasers, even though a portion of the purchase money is unpaid. Our courts have construed the statute regulating the sale of public school land to be an offer on the part of the State to sell the land, and hold that the sale is completed when an application in compliance with the law is filled in the General Land Office, together with the first payment. Pohle v. Robertson, 102 Texas, 274; Metzler v. Johnson, 20 S. W., 1116. Many other cases could be cited.

Under the facts of the case and the findings of the trial court, the Kenedy Pasture Company is estopped absolutely to claim the lines of these surveys, Paistle and Barrosas, elsewhere than as patented. Sullivan v. State, 95 S. W., 645; Hamilton v. State, 152 S. W., 1117; Maxwell Land Grant Case, 121 U. S., 325; Montgomery County v. Angier, 74 S. W., 957; Forbes v. Withers, 71 Texas, 306; Potivent v. Scarborough, 103 Texas, 111; Arguello v. U. S., 18 Howard, 546.

The case, as far as the Barrosas and the El Paistle are concerned, is therefore one of boundary, but for the question of boundary there would have been no case as to them. They come under the rule announced by the Supreme Court in the case of Schiele v. Kimball, (194 S. W. 944).

It is shown that it would have been impossible to adjust the equities because the purchasers have paid the real consideration for the land by their occupancy, and further that Kenedy et al. were not entitled to an adjustment of equities because they made no offer to adjust the equities. Moreover, the statement of the Court of Civil Appeals, on page 19 of its opinion, that the evidence fully sustained the finding that all the appellees, except the State, had title by limitation, is a judgment of the Court of Civil Appeals on the facts, which is of course, conclusive; and this judgment or finding is not attacked in any proper way in the application, if indeed it could be considered by this court.

As has already been intimated herein, this case, as far as the El Paistle and Barrosas are concerned, is wholly one of boundary. The validity of these two grants was admitted by all parties, and but for the contention of the Kenedy Pasture Company et al., which was not sustained, that these two grants covered a portion of the land sued for, there would have been no suit by the State against the Kenedy Pasture Company, the owner of these two grants, and no cross action by the Kenedy Pasture Company against those holding under the State. The judgment of the Court of Civil Appeals therefore as to these two grants and as to the Kenedy Pasture Company is final, under the rule of Schiele v. Kimball, 194 S. W. 944.

The same is true as to the Crockers and the Crocker lands. But for the contention of Kenedy et al. and the Kenedy Pasture Company, that the Abajo and the Barrosas covered the Crocker lands, which contentions were not sustained, there would have been no suit as to the Crockers and as to the Crocker lands.

As to the Abajo, the question of title is one of which the Supreme Court would have jurisdiction if error were shown in the decision of the Court of Civil Appeals on this question of such importance to the jurisprudence of the State as requires correction. But we take it that, under the statutes and decisions, the Supreme Court even as to the Abajo has no jurisdiction to try the question of boundary. In addition, however, to the fact that the judgments of the Court of Civil Appeals on questions of boundary are final, the questions raised by these assignments are questions of fact, and as questions of fact only are they presented by the assignments.

The title acquired by Pedro Villereal, if any, being an incomplete and equitable title only, and the undisputed evidence showing that the heirs of Pedro Villereal during a period of at least twenty-five years abandoned the possession of said land and asserted no right to its possession and wholly failed to pay any taxes on the land and permitted its acquisition, possession and use during all of said time by persons claiming under the State without attempting to dispossess them or to assert any right to said land, it will be conclusively presumed that they intended to abandon, and did abandon, all claim to said land. Constitution of 1876, Art. 13, Sec. 3; Constitution of 1876, Art. 13, Sec. 2; Hollingsworth v. Holshousen, 17 Texas, 41; Dikes v. Miller, 24 Texas, 417, 427; Sideck v. Duran, 67 Texas, 256; Adels v. Joseph, 148 S. W., 1155; Burroughs v. Farmer, 45 S. W., 846; Veatch v. Gray, 91 S. W., 324; Huggins v. Reynolds, 112 S. W., 116; Sena v. United States, 189 U. S., 233, 47 Law. Ed., 788; United States v. Repentigney, 5 Wall., 211, 18 Law. Ed., 627; Timber v. Desparois, 18 S. D., 587; 1 Corpus Juris, 10-11; 16 Cyc., 154.

*Ball & Seeligson* and *C. W. Trueheart,* for defendants in error 'Tarilt and others.

Under the facts, it is clear that these appellees held the legal title to such part of the land in controversy as is covered by said 19 patents, and that this title is subsequent in origin to appellants' equitable title, if any, to the same land. Flash v. Herndon, 44 S. W., 608, 609; Miller v. Gist, 91 Texas, 339; Adams v. House, 61 Texas, 639 641; Barroum v. Culmell, 90 Texas, 93, 95; Baldwin v. Root, 90 Texas, 546, 551; Johnson v. Newman, 43 Texas, 628, 642; Hill v. Moore, 62 Texas, 610, 613-615.

So far as we are informed, it has been consistently held that one who asserts a prior equitable title to land cannot defeat a subsequent legal title without showing that the holder thereof purchased with notice of such prior equitable title, or that he was not a purchaser for value. Teagarden v. Godley Lumber Co., 105 Texas, 616, 620; Sparks v. Taylor, 99 Texas, 411, 421; Rogers v. Houston, 94 Texas, 403, 406; Baldwin v. Root, 90 Texas, 546, 552; Hill v. Moore, 62 Texas, 610, 613-615; Johnson v. Newman, 43 Texas, 628, 642; Kirby Lbr. Co. v. Smith, 185 S. W., 1068; Delay v. Truitt, 182 S. W., 732, 735; Fordtran v. Perry, 60 S. W., 1000, 1002; Peterson v. McCauley, 25 S. W., 826, 829; Saunders v. Isbell, 24 S. W., 307. The finding, of absence of notice, being one of fact, must, under the authorities, be sustained if there is any competent testimony to support it, and even if there were a preponderance of evidence to the contrary. Love v. Breedlove, 75 Texas, 649, 652; Haley v. Sabine etc. Co., 150 S. W., 596, 599; Chase v. Veal, 83 Texas, 333, 335; M. K. & T. v. Cox, 144 S. W., 1196, 1197; Edwards v. Youngblood, 162 S. W., 1164, 1166; Schumm v. Anderson, 172 S. W., 1121. If it be presumed from the recital in their deeds that the Driscolls knew of a Spanish or Mexican grant to the land, it must also be presumed that they knew that it had ceased to exist—the whole recital being taken with all of its contradictions. Graham v. Hawkins, 1 Posey Unrep. Cases, 514; San Augustine County v. Madden, 87 S. W., 1056, 1059; Stanley v. Schwalby, 162 U. S., 255, 40 L. E., 960, 967; Manchester v. Gosewich, 130 S. W., (9 Ark.) 526, 527; Buttrick v. Holden, 13 Met., (Mass.) 355, 357; Curtis v. Blair, 59 Am. Dec., (Miss.) 257, 263; Rogers v. Wiley, 56 Am. Dec., (Ill.) 491, 492; Pomeroy Eq. Juris., Vol. 2, p. 990 (Sec. 601).

The recital plainly refers only to a title under a grant, that is, a legal title, while the only title, if any, appellants had was a mere equitable title, held by the court to exist wholly independent of the Villareal grant; and it has been consistently held that notice of one outstanding claim of title is not notice of another outstanding claim, or, as otherwise expressed, notice of one defect in title is not notice of another defect. Allen v. Anderson, 95 S. W., 54,

55; Middleton v. Johnston, 110 S. W., 789, 792; Fire Assurance Company v. Flournoy, 84 Texas, 632, 636; Graham v. Hawkins, 1 Posey Unrep. Cases, 514; Jackson v. Valkenburg, 8 Cow. (N. Y.), 257, 262; Bailey v. Railway, 60 S. W. (Ky.), 631, 632. As said in Bailey v. Railway, *supra*, "one is not required to suspect a latent equity where there is nothing upon the face of the title papers giving specific notice of such equity."

If it be suggested that the information implied by the recital with reference to the Villareal grant should have put the Driscolls on inquiry, we would respond that there is nothing here to affect their conscience as purchasers, nor is any tangible clue to appellants' equitable title afforded them, and all of their suspicions are allayed by the very terms of the recital. Wardlow v. Miller, 69 Texas, 395, 401; Graham v. Hawkins, 1 Posey Unrep. Cases, 514; Grayson Lbr. Co. v. Young, 86 S. E., (Va.) 826, 828; Robertson v. Wheeler, 44 N. E., (Ill.) 870, 874; Chadwick v. Clapp, 69 Ill., 119, 123; Chicago v. Witt, 75 Ill., 211, 214; White v. Carpenter, 2 Paige Ch., (N. Y.) 217, 249; 39 Cyc., 1785. Besides such an inquiry would have lead inevitably to the alleged Villareal grant, as then recorded in the Cameron County records. It has been consistently held that if one takes title with notice of a void deed to another, he also takes title with knowledge of the fact that it is void, and therefore gets good title. McCracken v. Flanagan, 141 N. Y., 174, 178; Osmer v. Sheasley, 68 Atl., (Pa.) 965, 967; Koenig v. Dohm, 70 N. E., (Ill.), 1061, 1065; Everett v. Todd. 35 Pac., (Colo.) 544, 545; Pearson v. Creed, 20 Pac., (Calif.) 302, 303; Loomis v. Brush, 36 Mich., 40, 47. A most suggestive application of this rule is found in the case of Bryan v. Crump, 55 Texas. 1, 15. Where, it may be asked, could they have turned,—what clue did they have to follow? Why make any further inquiry, when the claim of these heirs was plainly centered on this grant, and when this grant was as clearly void? By it their inquiry was satisfied, and they could buy in good faith. Wethered v. Boon, 17 Texas, 143, 149; Pipkin v. Ware, 175 S. W., 808, 811; Bacon v. O'Connor, 25 Texas, 213; Bank v. Delano, 48 N. Y., 326, 337. For, though given notice of this adverse claim of the Villareals, they were given by this void grant sufficient reason to believe such claim destitute of any just or legal foundation. Dorn v. Dunham, 24 Texas, 366, 380; Wilson v. Williams, 25 Texas, 55, 65; Eylar v. Eylar, 60 Texas, 315; Wade on Notice, par. 297; Kilgore v. Graves' Heirs, 2 W. & W., C. C., pp. 254, 260; Ramirez v. Smith. 94 Texas, 184; Stewart v. Crosby, 26 S. W., 138; Pomeroy's Eq. Juris., par. 615, 616.

The statute (3 years) does not make the fact that the owner of a certificate of a head-right is aware, at the time of locating his certificate, that his survey conflicts with a prior valid grant, an

exception to the running of the statute in his favor, or debar him from its protection, if the owner of the superior title failed to prosecute his suit within the time prescribed by law.  Whitehead v. Foley, 28 Texas, 1, 14, (See also Grigsby v. May, 84 Texas, 240, 255).  Judge Moore, in the Whitehead case, stresses the fact that where the claimant had reason to believe the previous grant void. or that it had been abandoned, his title was not inconsistent with "intrinsic fairness and honesty," and the statute of three-year limitation would run in his favor.

To hold that a subsequent location and patent are absolutely void because the land was covered by a prior and valid location is to produce such changes in the law of real property as cannot reasonably be supposed to have been the intent of the framers of the Constitution.  Many tracts of land are now supposed to be safely held under junior locations and patents, accompanied by three-year adverse possession, and such junior titles have been consistently sustained by the Courts of this State on the theory of three-year limitation.  Grigsby v. May, 84 Texas, 240, 249; League v. Rogan, 59 Texas, 427, 432; Galan v. Goliad, 32 Texas, 776, 787; Charle v. Saffold, 13 Texas, 94, 109; Converse v. Langshaw, 81 Texas, 275, 278; Sabine, etc., Lumber Co. v. Cagle, 149 S. W., 697, 699-701; Payne v. Ellwood, 163 S. W., 93, 96; Campbell v. Gibbs, 161 S. W., 430, 436; Horton v. Halff, 147 S. W., 735.

A survey was required by the Act of 1852, as a prerequisite to issuance of patent, and under the circumstances of the instant case, the surveys made for said purpose, followed by the issuance and delivery of the patents, must be held to have been authoritative compromises and adjustments of the true grant lines of the El Paistle and Las Barrosas.  United States v. Roselius, 15 How., 31, 14 L. E., 587, 589; West v. Cochran, 58 U. S., 403, 15 L. E., 110, 115; Arguello v. United States, 59 U. S., 539, 15 L. E., 478, 481; Sideck v. Duran, 67 Texas, 256, 264.

The third distinct ground for an estoppel against appellant as contended for by appellees, is that the El Paistle and Las Barrosas patents still stand uncancelled and unannulled, and it would be conclusively presumed that they define the true and correct lines of said grants.  This position is sustained by the following authorities:  De Guyer v. Banning, 167 U. S., 723; United States v. Halleck, 1 Wall., 439; Stoneroad v. Stoneroad, 158 U. S., 240; United States v. Falsom, Fed. Cas., 15126; United States v. de Haro, Fed. Cas., 14940.

The 1848 grant from the Mexican Government to land in Texas is void and of no force or effect.  State v. Bustamente, 47 Texas, 320, 321; Haynes v. State, 85 S. W., 1029, 1042; Reese v. Cobb, 135 S. W., 220, 224; Garcia v. Lee, 12 Pet., 511; Coffee v. Groover,

123 U. S., 1.; Robinson v. Minor, 10 How., 628; Henderson v. Poindexter, 12 Wheat, 530; Poole v. Fleeger, 11 Pet., 185.

*John L. Terrell* and *Lindsay D. Hawkins* for defendants in error Tindall and others.

On notice of the Abajo grant to purchasers from the State. Fisher v. Crescent Oil Co., 178 S. W., 905; M. K. & T. Ry. Co. v. Hendricks, 108 S. W., 745; Int. Fire Ins. Co. v. Black, 179 S. W., Rep., 534.

The judgment rendered herein in favor of Geo. M. Crocker, Frank E. Crocker, Arthur Verne Crocker and M. L. Crocker (hereafter referred to as—the Crockers), awarding to them the lands claimed by them respectively, should be affirmed, if for no other reason than the fact that the appellants, and each and all of them, lost title to said lands, if any they ever had, by limitation long prior to the filing of this suit, and prior to the filing of their suit by cross-action herein against said Crockers.

MR. CHIEF JUSTICE PHILLIPS delivered the opinion of the court.

The suit involves about 30,000 acres of land in Willacy County—formerly a part of Cameron County. There are a great many parties to it and a number of complicated issues.

In the main, it is a controversy between the State and those holding under the State, on the one side, and John G. Kenedy, a large number of Mexicans, some interveners and the Kenedy Pasture Company, a corporation, on the other, concerning the title and the location of what the latter parties claim is the Santa Rosa de Abajo Grant, a grant made by the Mexican Government, and to which all of these parties except the Kenedy Pasture Company assert title.

The Abajo Grant, if located as these parties contend it should be, comprises part of forty-nine sections of land, now claimed by the State and those holding under the State, besides an additional strip of land and an inset lying immediately to the west of those sections.

The Kenedy Pasture Company claims certain of these forty-nine sections and parts of sections as included within the real boundaries of the original Mexican grants, the El Paistle and the Las Barrosas, both owned by it and lying immediately to the east and south of the sections. To such sections and parts of sections it also asserts a limitation title.

The suit also embraces a controversy between those of the parties called the Fant Heirs and those claiming the Abajo Grant, over the strip and the inset lying immediately west of the forty-nine sections. This strip and inset are claimed by the latter as within the true lines of the Abajo Grant. The Fant Heirs claim the same

land as a part of the Arriba Grant, a survey owned by them and lying to the west of the Abajo and the forty-nine sections.

The effect of the contention of Kenedy and the other parties adverse to the State and the claimants under the State, is to locate the western boundary lines respectively of the Abajo, the El Paistle and the Las Barrosas Grants more than a mile further west than as maintained by the latter, and the northern line of the Las Barrosas slightly further north.

We subjoin two sketches which show with approximate correctness the situation of these grants and the land in controversy. The first shows the grants if located as contended for by the State and the parties in common with it. The broken lines indicated on the second show their location according to the contention of the parties adverse to the State and the claimants under it.

SKETCH No. 1

SCALE   ONE INCH = 1000 VARAS

SKETCH No. 2
SCALE : ONE INCH = 1000 VARAS

The El Paistle and Las Barrosas Grants were confirmed by the Legislature in 1852. There is no question as to their validity. They were surveyed and patented for Mifflin Kenedy in 1873. This was prior to the locations made on the Abajo Grant under the authority of the State. They were conveyed in 1882 by Mifflin Kenedy to the Kenedy Pasture Company.

In 1904 the State, in a suit against D. R. Fant and D. Sullivan, recovered, as excess land of the Arriba Grant, what is delineated on the sketches as the ''Crocker Land''—the tier of eleven sections lying to the west of the other thirty-eight sections here involved.

The State's suit, here, for the benefit of itself and those holding title under it, was for the land comprising these forty-nine sections. In its petition the land was substantially described as being bounded on the North by Olmos Creek; on the east by the west boundary lines of the El Paistle and Las Barrosas Grants as patented; on the south by the Las Barrosas as patented; and on the west by the east boundary line of the Arriba as established by the judgment in the suit of the State against D. R. Fant and D. Sullivan.

The thirty-eight numbered sections, other than the Crocker Land, shown on the sketches: viz., Sections Nos. 81, 82, 83, 1, 3, 80, 79, 2, 4, 84, 77, 78, 61, 60, 76, 75, 62, 59, 73, 74, 63, 58, 72, 65, 64, 57, 71, 66, 55, 58, 70, 67, 54, 51, 69, 68, 53, and 52, were surveyed in the years 1879 and 1881 under railroad certificates owned by F. J. Parker, the nineteen odd numbered sections being surveyed for Parker, and the nineteen even numbered sections for the School Fund. The nineteen odd numbered sections were patented to Parker in 1888.

The Fant Heirs hold title to these nineteen odd numbered sections under the patents issued Parker: viz., Sections Nos. 81, 83, 1, 3, 79, 77, 61, 75, 59, 73, 63, 65, 57, 71, 55, 67, 51, 69, and 53.

Of the nineteen even numbered sections surveyed for the School Fund, nine: viz., Sections Nos. 66, 64, 72, 54, 70, 62, 76, 78, and 74, were sold to settlers in 1898, 1904 and 1908 on condition of settlement, the payment of one-fortieth of the purchase price and the execution by the purchasers of their obligations for the balance.

The remaining ten of the even numbered sections are held by the State for the School Fund, unsold.

The eleven sections delineated on the sketches as the ''Crocker Land,'' lying to the west of the thirty-eight sections, were likewise sold by the State to the Crockers, in 1908 and 1909, on condition of settlement, payment of one-fortieth of the purchase money and execution by the purchasers of their obligations for the balance.

These purchasers from the State all completed their occupancy as required by law. Since their purchase they have continuously held possession of these several sections, as have the Fant Heirs of the nineteen sections held under the Parker title from the State, interrupted only by the extension of a fence by the Kenedy Pasture Company along what it claims are the true western lines of the El Paistle and the Las Barrosas. This fence was extended not in right of the Abajo Grant, but in right only of the Kenedy Pasture Company's claim as to the true location of the El Paistle and Las Barrosas. The right of these parties holding under the State remained unquestioned by the adverse claimants to the Abajo until the filing of a suit in Cameron County in 1904, which was consolidated with this suit.

Under the contention of the State and those in common with it as to the location of the Abajo Grant, the thirty-eight sections surveyed under the railroad certificates, alone, are upon the Abajo, and the Crocker eleven sections lie without it and to the west.

According to the contention of Kenedy and the other parties adverse to the State and its claimants as to the location of the El Paistle and Las Barrosas Grants, those two grants, as shown by the second sketch, conflict with the sections along the east of the thirty-eight sections, with Crocker Section No. 1 and a part of Crocker Section No. 2 and the southern portions of Sections 68 and 69 and a part of the southern portion of Section 53; and if the Abajo be located as

contended by them, it includes all of the remaining forty-nine sections and, in addition, the strip and the inset to the west of them.

The trial court and Court of Civil Appeals sustained the contention of the State and its claimants as to the location of all three of these grants.

The facts concerning the Mexican title to the Abajo Grant asserted by Kenedy, the Mexican defendants and the interveners, and notice of it by the claimants under the State, are substantially these:

In 1832, Antonio Canales, a Survey General of the Mexican State of Tamaulipas, surveyed the land claimed to be comprised by the Abajo Grant, and which then lay within the State of Tamaulipas, for Pedro Villareal, who was in possession of the land at that time. Following the survey and prior to 1835, Villareal paid to the proper Mexican authorities the purchase money for the land—$165.00, the amount at which it was appraised. His expediente was forwarded to the Governor of the State of Tamaulipas, and his right to receive final title or a grant was recognized by the authorities of the State.

Years later, on April 12, 1848, after the establishment of Texas Independence and after the signing of the Treaty of Guadalupe Hidalgo, a purported grant to the land was issued to Villareal by the Governor of the State of Tamaulipas.

Villareal was in possession of the land in person or by representatives until 1850 or 1860. Since that time there has never been any possession by him or any one claiming under him. He nor any one claiming under him has ever paid any taxes on the land. It was rendered for taxes for his heirs but twice, in 1880 and 1881, by W. A. Crafts as attorney. In 1882 it was assessed against "Unknown Owners."

The grant issued to Villareal by the Mexican Governor of Tamaulipas and the field notes claimed to have been made by Canales, were filed by W. A. Crafts as attorney for the heirs of Villareal in the office of the County Clerk of Cameron County on August 8, 1879, and recorded as one instrument.

The field notes were filed by Crafts with the County Surveyor of Cameron County and a re-survey of the land requested, August 18, 1879.

In November 1879 the County Surveyor made the re-survey as requested by Crafts. The field notes of the re-survey were filed in the Surveyor's office, December 15, 1879, and in the General Land Office, December 31, 1879, reciting that they were of a re-survey of a grant "made for the heirs and assigns of Pedro Villareal to whom the land was originally granted by the State of Tamaulipas and surveyed by Canales, original map and field notes bearing date of December 21, 1832, and recorded in Clerk's office of Cameron County."

On February 3, 1887, a certified copy of the Cameron County record of the grant to Villareal and the field notes, was filed as one instrument in the General Land Office.

In the deed from the estate of F. J. Parker to R., and J. Driscoll and D. R. Fant, conveying the nineteen sections claimed by the Fant Heirs and through which they deraign title, and also in the deed from the Driscolls to D. R. Fant, the ancestor of the Fant Heirs, it was recited that those sections were located over a Spanish grant to Pedro Villareal which had become forfeited to the State of Texas.

At the time F. J. Parker located his surveys on the Abajo Grant he had notice that Judge James B. Wells, of Brownsville, had seen what purported to be a grant to the Abajo issued to Pedro Villareal on April 12, 1848, by the Governor of the State of Tamaulipas, and that it appeared on its face to be an original grant.

When the parties claiming under the State acquired title to their portions of the Abajo, there were on file in the General Land Office a number of official maps on which was indicated a survey of the Abajo Grant, there appearing within the lines of the survey on these maps the words, "Santa Rosa de Abajo, Pedro Villareal." As found by the trial court, the purchasers from the State of the nine even numbered sections of the thirty-eight, and of the Crocker sections, had notice of these maps, which we infer to mean actual notice.

Aside from the grant issued by the Mexican Governor of Tamaulipas to Villareal on April 12, 1848, the title of Villareal to the Abajo rested entirely upon the evidence afforded by copies of certain letters from Mexican officials dated in the years 1832, 1833 and 1834. These letters, after a prolonged search instituted by Jno. G. Kenedy for evidence of the Villareal title, were found by Frank C. Pierce, an attorney for Kenedy, in the archives of the Municipality of Reynosa, Mexico, in 1904 or 1905. It does not appear that any of the claimants under the State had any notice of these letters, or of the matters to which they purport to relate, until after this controversy over the land began.

In 1878, or prior thereto, F. J. Parker built a fence along or near the supposed east line of the Arriba Survey, which the trial court found to be approximately the west line of the Abajo. This fence extended from south of the south line of the Abajo north to a point south of Los Olmos Creek, thence running west, south of the creek, enclosing the Arriba Grant and other lands.

In 1883 the Kenedy Pasture Company, the owner of the El Paistle Grant, built a fence along the west line of that grant as claimed by it, being located approximately upon what the Kenedy Pasture Company and the other parties here adverse to the State and its claimants assert to be the dividing line between the Abajo and the El Paistle Grants, and extending from Los Olmos Creek on the north to the Las Barrosas Grant, as patented, on the south.

In the year 1885, or prior thereto, Mrs. King, who owned certain land north of Los Olmos Creek, erected a fence from a half mile to a mile north of the creek, running east and west parallel there-

to and connecting the Kenedy Pasture Company fence on the east.

In the year 1885 D. R. Fant erected a fence extending east and west a short distance north of the south boundary line of the Abajo and connecting the fence erected on the west line of the Abajo with the Kenedy Pasture Company fence on the east.

In 1886 the Kenedy Pasture Company erected a fence along the north line of the Las Barrosas Grant, as patented, extending from the Kenedy Pasture Company fence on the east of the Abajo along the south line of the Abajo and connecting with the Parker fence erected along the west line of the Abajo. When this fence was erected by the Kenedy Pasture Company, D. R. Fant removed the fence which had been erected by him in 1885 along the south line of the Abajo.

In 1885 D. R. Fant extended the old Parker fence on the west line of the Abajo north across Los Olmos Creek, so as to connect with the east and west fence of Mrs. King above mentioned. This connection completed the enclosure of that part of the Abajo included within the boundaries of the Parker fence on the west and the Kenedy Pasture Company's fence running through the eastern portion of the survey of the Abajo as fixed by the trial court, there being included however in the enclosure certain other lands north of Los Olmos Creek.

About the year 1885 D. R. Fant ran a division fence from a point on the west line of the Abajo, and at about the southern portion of the off-set in the west line, connecting the Parker fence on the west with the Kenedy Pasture Company's fence on the east and dividing the Abajo into two enclosures, each containing about 5,000 acres of land. About the same time Fant erected some fences for the purpose of enclosing certain small pastures near the ranch head-quarters, some of such enclosures being east and some being west of Parker's old fence. The fences erected by the Kenedy Pasture Company were kept up by it; and the Parker fence and other fences erected by D. R. Fant, and Mrs. King's fence running north of Los Olmos Creek, were kept up by Fant continuously from the time of their erection and were sufficient to turn stock.

When the Kenedy Pasture Company built its fence in 1883 along what it claims to be the west line of the El Paistle Grant, there was brought within the enclosure the eastern portion of the Abajo as the Abajo was located by the trial court, being that portion shown east of the broken line on sketch No. 2 extending north and south through the Abajo. This part of the Abajo as fixed by the trial court has since been in the continuous and exclusive possession of the Kenedy Pasture Company. The whole enclosure however of which it was thus a part comprised more than 5,000 acres of land, and there was no segregation of that part of the Abajo thus enclosed from the other land within the enclosure.

About the year 1885 D. R. Fant dug three wells on different ones of the nineteen odd numbered sections on the Abajo Grant claimed by the Fant Heirs, for the purpose of supplying water for cattle; and continuously from 1883 the Fant Heirs and their predecessors in title have grazed cattle on those sections and excluded other stock therefrom, except in isolated instances.

Since 1878, or earlier, and for a continuous period of more than ten years, F. J. Parker, the Driscolls and D. R. Fant, whose title is held by the Fant Heirs, had open, adverse possession of the strip of land and inset lying to the west of the Crocker lands, using and enjoying such strip and inset enclosed by a substantial fence, and such strip and inset being claimed as a part of the Arriba Grant owned by them.

The case was tried without a jury, and the trial court found, among other things, that the purported grant of the Abajo Survey, issued by the Governor of the Mexican State of Tamaulipas to Pedro Villareal, of date April 12, 1848, was void.

It further found that while this grant was void and vested no title in Villareal, yet prior to December 19, 1836, Villareal acquired, in accordance with the laws of Mexico in force at that time, the right to a grant of the Abajo Survey, and hence an equitable title to the Abajo Grant, good as against the State of Texas and as against purchasers from the State with actual or constructive notice of such equitable title. This holding that Villareal acquired an equitable title to the Abajo Grant was based upon the evidence afforded by copies of the letters of Mexican officials found in the archives of the Municipality of Reynosa, Mexico, which have been referred to in a previous part of this statement.

The court found that the Fant Heirs, holding the nineteen odd numbered sections on the Abajo under patents from the State, and the purchasers from the State of the nine of the remaining nineteen even numbered sections on the Abajo, were innocent purchasers for value of those sections without either actual or constructive notice of the Villareal equitable title to the Abajo Grant, and hence that their respective titles to those sections were superior to that equitable title.

It found that the Kenedy Pasture Company had failed to establish title by limitation to that part of the Abajo Grant within its fences.

It found that the Fant Heirs had title under the Ten Years Statute of Limitation to the strip and inset lying to the west of the Crocker Land.

It found that the Fant Heirs had title under the Three and Five Years Statutes of Limitation to all of the odd numbered nineteen sections on the Abajo lying west of the fence built by the Kenedy Pasture Company through the eastern portion of the Abajo extending from

Los Olmos Creek and south to the north line of the Las Barrosas Grant.

As has already been stated, the Court fixed the location of the Abajo, the El Paistle and the Las Barrosas Grants as contended for by the State and those claiming under the State.

Judgment was accordingly rendered as follows:

In favor of the Fant Heirs for the nineteen odd numbered sections on the Abajo Grant and for the strip and inset lying to the west of the Abajo Grant and the Crocker land.

In favor of the Crockers for the eleven sections lying to the west of the Abajo Grant.

In favor of purchasers from the State, Tindall and wife, Mrs. Jeffers and Sam M. Boyd for nine of the nineteen even numbered sections on the Abajo Grant surveyed for the State and purchased by them: to-wit, Sections Nos. 66, 64, 72, 54, 70, 62, 76, 78 and 74.

In favor of John G. Kenedy, the Mexican defendants and the interveners for the remaining ten of the nineteen even numbered sections on the Abajo surveyed for the State; to-wit, Sections Nos. 80, 82, 4, 60, 2, 84, 52, 56, 58, and 68.

It was further adjudged that the Kenedy Pasture Company take nothing and that the State of Texas take nothing except its rights securing the unpaid purchase money due it on the sections adjudged to the purchasers from it.

The judgment was affirmed by the Court of Civil Appeals.

The important questions in the case are the validity of the grant made by the Governor of the Mexican State of Tamaulipas, April 12, 1848, to Pedro Villareal; whether, independently of the grant, Villareal acquired an equitable right or title to the land comprised in the so-called Abajo Grant, as found by the District Court and Court of Civil Appeals; and if Villareal did acquire such a right or title, whether the purchasers from the State, Tindall and others, and the Fant Heirs, holding under patents from the State, have title to their respective sections superior to the Villareal right or title, as innocent purchasers for value without notice.

The disputes as to the boundaries of the Abajo, the El Paistle and the Las Barrosas Grants and the limitation questions involved in those disputes, we do not feel called upon to determine. They are boundary controversies, pure and simple. It is evident that as to them there would have been no case except for the disputes over the location of the lines of those grants. Cox v. Finks, 91 Texas, 318, 43 S. W., 1. The limitation title asserted by the Kenedy Pasture Company to the eastern tier of sections and parts of sections and parts of some of the southern sections as delineated upon the sketches, as embraced within the El Paistle and Las Barrosas Grants, grows out of the disputes as to the boundaries of those grants, and

is but a part of the controversy over their boundaries. The limitation title asserted by the Fant Heirs to the strip and inset west of the Crocker lands is equally but a part of a boundary dispute. The right of the whole case does not depend upon a determination of the boundary controversies, and we therefore have jurisdiction of it. But no other part of the case is concerned in the boundary disputes. Their adjudication affects, and can affect, no other issue. They are in the case as independent boundary controversies, of which, ordinarily, the jurisdiction of the Court of Civil Appeals would be final. All other issues in the case lie entirely without them, and the settlement of those issues in nowise involves their adjudication. With this true, we do not feel that a review of the boundary controversies is imposed upon this court.

Since the presence of other distinct issues, in no way involving the questions of boundary, gives the case an independent character other than that of a "boundary case," the boundary disputes do not, as we have said, affect our jurisdiction of the case. And if for the settlement of these other issues it were necessary to determine the boundary disputes, we would determine them. That would be essential to our jurisdiction over the other issues. Such was the condition in West Lumber Company v. Goodrich, 223 S. W., 183. That case was an action for conversion involving the question of the boundaries of the land—analogous to Steward v. Coleman County, 95 Texas, 445, 67 S. W., 1016—, as well as purely a dispute over the land depending entirely upon the ascertainment of its true boundaries. Since the case in respect to the action for conversion necessarily involved the boundary question, we felt warranted in approving the opinion of the Commission of Appeals in its determination of that question. In such a case the determination of the boundary controversy as involved in one phase of the case would necessarily determine it as to all phases. The settlement of the purely boundary dispute would result from its determination in the adjudication of the other part of the case, and as necessary to a consistent holding and judgment. But there is no such situation here as was presented in West Lumber Company v. Goodrich. The boundary disputes here are independent and separable controversies. The other parts of the case do not involve them. The determination of the other issues does not depend upon their settlement. We therefore are of opinion that the finality of the judgment of the Court of Civil Appeals as to them should be respected.

Aside from this, the questions of boundary and limitation here were essentially questions of fact. It cannot be reasonably contended that there is no evidence supporting the trial court's judgment in their regard; and we would therefore not be authorized in reversing that part of the judgment. Findings of fact by the trial court and

the Court of Civil Appeals, with evidence to support them, are conclusive upon this court.

The land in controversy lies in what was at one time the Mexican State of Tamaulipas, between the Nueces and Rio Grande rivers. This is the foundation of the claim, very earnestly pressed by Kenedy and others holding under Villareal, that the Governor of Tamaulipas had authority to issue Villareal a grant on April 12, 1848, and that the grant of that date in Villareal's favor is accordingly valid and protected by the Treaty of Guadalupe Hidalgo. This is a far-reaching contention, so we will examine it. It involves the sovereignty of Texas over this territory, and is a direct challenge of that sovereignty at the time this grant was issued.

One of the things demanded by General Houston of Santa Anna following the victory of San Jacinto was that he require of his subordinate commanders the immediate withdrawal beyond the Rio Grande of all Mexican troops in Texas; and this was done. This was the first assertion by the new-born Republic of dominion clear to the utmost Mexican border. On December 19, 1836, the Congress of the Republic declared that the sovereignty of Texas extended to the Rio Grande, defining the southern and western boundary of Texas as beginning at the mouth of that river, and running thence up its principal stream to its source. In the annexation of Texas to the United States as a State, the Rio Grande was accepted as the boundary between Texas and Mexico. It is fair to say that upon no other terms would Texas have consented to the annexation.

The acceptance of that boundary line was the basis of President Polk's policy in the opening of the war with Mexico. Its dispute by Mexico led to the war. Early in 1846, following the annexation of Texas in the previous December, President Polk ordered General Taylor to advance to the Rio Grande, which he did. The Mexican commander at Matamoras demanded General Taylor's withdrawal to the Nueces. He refused. On April 23rd the Mexicans crossed the river and ambushed a body of the American troops. Two weeks later they attacked General Taylor in the Battle of Palo Alto,— May 8, 1846, in which they were repulsed. On the next day Tayler drove them back across the river in a disastrous rout. And on the 18th of May General Taylor crossed the Rio Grande and occupied Matamoras.

The attack upon the American troops of April 23rd was the occasion of President Polk's message to Congress, declaring that Mexico had passed "the boundaries of the United States" and had shed American blood "upon American soil," and that in consequence a state of war existed.

The territory between the Nueces and the Rio Grande remained largely under the actual possession and jurisdiction of Mexico until

1846. But after the establishment of Texas independence through the defeat of Santa Anna's army, his recognition of Texas sovereignty, and particularly the resolution of the Congress of the Republic of December 19, 1836, that jurisdiction was never a rightful one. It was but a de facto possession.

Such as it was it came to a complete end when early in 1846 United States troops in behalf of Texas and for the enforcement of her rights with respect to this very area, occupied the territory and ousted the Mexicans from it. This has never been doubted. Not only was Mexican authority at an end in the territory early in 1846, but in September 1847 United States troops had captured the Mexican capital and the entire country was subject to their arms.

With no right at all to this territory after 1836, it would be strange to admit the sovereignty of Mexico over it in 1848, when two years before the sovereignty of Texas had been perfected by reducing the territory to possession. It is equally anomalous to contend that in 1848 Mexican de facto possession of it continued, when in 1847 the entire country, with its capital, was in the hands of American troops and the defeat of Mexico an accomplished fact.

While Mexico's ouster from the territory was in progress, the Legislature of Texas, on April 29, 1846, enacted a joint resolution, declaring:

"That the exclusive right to the jurisdiction over the soil included in the limits of the late Republic of Texas was acquired by the valor of the people thereof, and was by them vested in the Government of the Republic; that such exclusive right is now vested in, and belongs to, the State, excepting such jurisdiction as is vested in the United States by the Constitution of the United States and by the joint resolution of annexation, subject to such regulations and control as the Government thereof may deem expedient to adopt."

This was a reaffirmation of the sovereignty of Texas over all territory within the borders of the Republic as defined by the resolution of December 19, 1836, and proclaimed both its rightful and actual jurisdiction over this territory.

The treaty of Guadalupe Hidalgo was signed February 2, 1848. It recognized the Rio Grande River as the boundary between Texas and Mexico, which was a recognition of the right of Texas to the entire area between the Nueces and the Rio Grande. It stipulated that the civil rights of Mexicans within the territory ceded by Mexico, as they existed under the laws of Mexico when the treaty was signed, should be protected.

The proposition asserted by the claimants under the Mexican title is therefore, that though the jurisdiction of Mexico over this territory was never rightful after 1836; though such jurisdiction

as it exercised was terminated early in 1846 by its complete ouster from the territory by American troops,—not only so,' but with the entire country of Mexico reduced by September 1847; and though this grant was issued in April 1848, more than two months after the signing of the treaty of peace and Mexico's recognition in the treaty of the right of Texas to the territory, still, that a Mexican official, in April 1848, had authority to exercise the sovereign power of granting away land within it; and that his acts, in derogation and repudiation of the sovereignty of Texas, must, in the Courts of Texas, be accepted as valid. The proposition largely sets aside the freedom from Mexican rule accomplished by the establishment of Texas independence. It ignores the constant proclamation of both the Republic's and the State's sovereignty over this territory after December 19, 1836, and the consummation of their rightful claim by effective possession. It asserts the authority of Mexico to grant land in Texas to which it had no right and of which it had no actual control. It attempts to extend the protection of the Treaty of Guadalupe Hidalgo to rights not in existence when the treaty was signed, but attempted to be created afterward. It is refuted by the decisions of this court and plain principles of international law.

It is a novel proposition to say that a sovereignty having no right to given territory, long after its dispossession, its defeat in a war growing out of dispute over the territory, and its express recognition of the superior right by the provisions of a solemn treaty, may lawfully exercise the sovereign authority of disposing of it by grant. If this be the law a mere de facto jurisdiction over territory once obtained by an unlawful sovereignty, is of a greater force, though terminated, than the lawful sovereignty's de jure and de facto possession and control combined. It is met by the simple proposition that a nation cannot grant away territory to which it has no title.

Considerations of policy and justice of course require of a de facto government the preservation of order and the adjustment of private rights and claims between individuals. For this reason the acts of the de facto government in actual possession of disputed territory in the ordinary administration of its laws, in so far as they affect private rights, are valid. Its acts affecting public rights, however, are void, since they are necessarily in derogation of the rightful, the de jure, sovereignty. The granting of the public domain is, of course an act affecting public rights. It has never been otherwise considered. Titles to land in ceded or even conquered territory acquired from a former sovereignty when it had the right to grant them are of course valid, even as against the succeeding sovereignty. But it is plain that this rule cannot apply to a grant of land in territory to which the sovereignty is-

suing the grant had at the time no right, even though it was in possession. If the sovereignty had no right to the territory, its possession was not rightful. An unlawful, even though an actual possession of land, cannot confer the power of disposing of the title. This is as true of nations as it is of individuals. In cases of disputed territory, when the true boundary is ascertained or adjusted by agreement, grants made by the unlawful sovereignty in the territory to which as thus ascertained it had no right, whether it had possession at the time of the grants or not, unless confirmed by express agreement, fail and are of no effect against the sovereignty to which the territory of right belonged. They fail simply because of want of title in the grantor. A de facto possession cannot supply the title. These principles are well established and are a part of the accepted law of nations. Coffee v. Groover, 123 U. S. 1, 31 L. Ed., 51.

Not only is a grant of land void where a part of territory to which the sovereignty making it had at the time no lawful right, even though it was in possession, but certainly after the signing of a treaty which recognizes the superior right of the opposing sovereignty, its power of granting away the territory is at an end. If its possession is not rightful, clearly its jurisdiction can obtain only for strictly municipal purposes. Until actual delivery of the territory it subsists for those purposes alone—to preserve the public order, the settlement of disputes between individuals and the like. But after the signing of the treaty its powers of sovereignty except strictly for those purposes, cease. It distinctly has no power to grant land or franchises. Such a power is one of the highest attributes of sovereignty, and its exercise would necessarily operate as a denial of the rights of the succeeding sovereignty. Davis v. Police Jury etc., 9 Howard, 279, 13 L. Ed., 138; Trevino v. Fernandez, 13 Texas, 664.

This court has never recognized the right of Mexico after early in 1846 to grant land in this territory. It has denied such right in every instance where it has considered the question of such authority. It has, in fact, never recognized the validity of any Mexican title to land in this territory originating after December 19, 1836, the date the Congress of the Republic proclaimed that the sovereignty of Texas extended to the Rio Grande. The only Mexican titles to land in the territory which it has recognized as within the protection of the Treaty of Guadalupe Hidalgo, except such as the Legislature has confirmed, have been either those granted prior to December 19, 1836, or those which prior to that date were good in equity and hence in good conscience entitled to the sanction of Texas courts. This is plainly declared in Haynes v. The State, 100 Texas, 426, 100 S. W., 912, where concerning lands in this same territory claimed under Mexican title, it was said:

"The land was surveyed for the State in 1884, and there is, of course, no question of the State's right to it unless the plaintiff in error has shown a right to the land which originated at a date prior to the 19th of December 1836, and which right is protected by the treaty of Guadalupe Hidalgo between the United States and Mexico."

This is because the sovereignty of Mexico over this territory after December 19, 1836, was never rightful, and Mexico accordingly had no power after that date to create titles to land within it.

To the same effect is The State v. Gallardo, 106 Texas, 274, where in relation to a Mexican title to land within the same territory and its protection by the Treaty of Guadalupe Hidalgo, it was said:

"The rights of the defendants should be determined, therefore, by the character of title under which they claim as it existed on December 19, 1836."

In The State v. Bustamente, 47 Texas, 320, there was before the court a grant by the Mexican Governor of Tamaulipas to land in this same territory, dated January 2, 1848—three months before the date of the grant in the present case—, the land having been surveyed in 1835. The authority of the Mexican Governor to make such a grant was denied in the opinion of Chief Justice Roberts in these words:

"The proof was therefore not sufficient, unless the Governor of Tamaulipas had, on the 2d day of January, 1848, the right to grant this land east of the Rio Grande, under the treaty of Guadalupe Hidalgo, concluded one month thereafter, to wit, on the 2d day of February, 1848.

"We are of the opinion that he had not such right. Texas claimed the territory, in defining its boundaries, on the 19th of December, 1836. In 1846, the claim was perfected by possession and the actual exercise of exclusive jurisdiction, and from that time it was lost by the State of Tamaulipas, in Mexico, for all purposes whatever, whether of judicial action or the exercise of powers relating to eminent domain. And it never afterwards recovered such lost powers. The action of the Governor, in making concession, was without authority, and neither advanced nor prejudiced the imperfect title to the land, which may have been acquired previous to the 19th day of December, 1836. (Halleck's Int. Law, page 798, section 22; Trevino v. Fernandez, 13 Texas, 664; Davis v. Police Jury of Concordia, 9 How.)"

It is said by counsel for the claimants under the Mexican title here that this part of Chief Justice Robert's opinion was dicta, since the court was considering a title under the Act of 1870 which related only to Mexican titles originating prior to December 19, 1836, whereas this title was shown by the date of the grant to have originated January 2, 1848. The holding cannot be disposed of in this way. It was not dicta. It is overlooked that there was a survey of the land made under Mexican authority in 1835, shown to have been presented with the claim as in part the basis of the right. The title was therefore

one plainly within the Act of 1870, as the court recognized in simply holding the evidence insufficient and remanding the case for further trial. The same title was before the court again in the Haynes Case, 100 Texas, 426, where it is shown that the title plainly originated prior to December 19, 1836, and where because of that fact and its being good in equity on that date, it was upheld against the suit of the State.

In The State v. Cuellar, 47 Texas, 295, there was before the court another Mexican grant made in 1848—November 21st—of land within what was the State of Tamaulipas. Concerning the power of the Mexican Governor to make a grant of the land, "in 1848," this was said by Judge Roberts:

"In reference to the first proposition, there can be no pretense that the. instrument signed by Alejo Gutierez, *in 1848*, is, or possibly can be, a conveyance, in the nature of a grant, to a tract of land in the State of Texas, by virtue of any power vested in him as an officer of a foreign country, (Tamaulipas,) at the time he signed the paper."

In the Haynes Case, 100 Texas, 426, the Mexican grant, the same as before the court in the Bustamente Case, was dated January 2, 1848, and was to land, as already stated, also in the former Mexican State of Tamaulipas. The title was sustained, not because of the grant, but because the title was, on December 19, 1836, good in equity. The title as based upon the grant was entirely discarded by the court. It is plain from the decision that the title would have been rejected by the court had it possessed no other foundation than the grant.

In the Sais Case, 47 Texas, 307, it was distinctly affirmed that Mexico entirely lost all control of this territory early in 1846, since which time Texas has constantly exercised jurisdiction over it. The holding in th' Gallardo Case, 106 Texas, 274, is to the same effect.

If this territory was under the de jure and de facto jurisdiction of Texas early in 1846, and that jurisdiction has since continued, as is the legal and historical fact, it is idle to say that in 1848 it was still subject to Mexican sovereignty and that the Mexican government had then the authority to dispose of land within it.

The grant considered in Clark v. Hills, 67 Texas, 141, 2 S. W., 356, cited by the claimants under the Mexican title, had been expressly confirmed by the Legislature. There is no intimation in that opinion, as there is none in any opinion of this court, that the Mexican government had authority to grant lands in Texas north or east of the Rio Grande after the signing of the Treaty of Guadalupe Hidalgo, or for that matter, after it lost its de jure jurisdiction in 1836.

In the opinion rendered in Texas-Mexican Railway Company v. Locke, 74 Texas, 370, 128 S. W., 80, Judge Stayton spoke of there being no evidence that the lands in controversy, originally titled to the Mexican predecessors of the defendants, did not belong to them "on July 4, 1848," the date the Treaty of Guadalupe Hidalgo was proclaimed, and if they did, that they were protected "in

so far as valid titles against the State of Coahuila and Texas on March
2, 1836.'' The isolated use of that date in such connection does not
affect the question here, much less control it. The grants upon
which the Mexican titles rested in that case were issued in 1834, when
the territory where the land lay was within the rightful jurisdiction
of Mexico. The opinion makes no pretense of holding that Mexico
had the right to grant away lands in Texas up to July 4, 1848, or
any time after it lost its rightful sovereignty over Texas.

With respect to the rights of either government under a treaty, the
treaty takes effect from the date it is signed. Haver v. Yaker, 9 Wallace, 32. Only as between individuals is its effect postponed to the
date of proclamation, and this only upon the ground of notice.

As early as the 13th Texas (Trevino v. Fernandez, 664) this court
fully recognized the doctrine already referred to, that where disputed
territory is ceded by a treaty, the power of the ceding government to
grant land within it ends with the signing of the treaty. It would be
idle to conclude a treaty relating to disputed territory, if between its
signature and proclamation the ceding government has the full right
to grant the territory all away.

The Mexican grant here was in our opinion clearly void under the
repeated decisions of this court, and, aside from express authority,
upon plain and just principles of law. Not at this late day is it to be
held that the authority of Mexico to dispose of the public domain of
Texas existed after its sovereignty was ended by the valor of the Texas
patriots and it was completely dispossessed from the soil.

While the grant issued by the Mexican Governor to Villareal was
void and conveyed no character of title, we are of opinion—contrary
to the contention of the State—that the District Court and Court of
Civil Appeals were right in their conclusion that there was evidence
showing that the Abajo Grant was surveyed for Villareal and that he
paid the Mexican authorities for it prior to 1836, and that by such
authorities his right to the land was recognized, affording him an inchoate or equitable title having its origin prior to December 19, 1836.
True, the proof was meager and fragmentary, as such proof would
naturally be, adduced at this remote period, particularly in view of
the destruction by French troops in 1864 of Victoria, the capital of
Tamaulipas, with its archives. But we do not think it can be fairly
said that there was no evidence to the effect stated.

This proof rested largely in the official letters found in 1904 by
Pierce, Kenedy's attorney, in the archives of the Mexican town of
Reynosa. Complaint is made of the admission of the copies of the
letters, but there was evidence of the genuineness of the originals,
and the copies were admissible in our opinion as compared copies.
The letters do not distinctly recite that the Abajo had been surveyed
for Villareal or that he paid for that particular survey. But they
do fairly show that a survey within that jurisdiction was made for

Villareal, that he had paid for the land so surveyed, all prior to 1836, and that also prior to that year his expediente, or instructive dispatch, had been forwarded the Governor for the issuance of final title. The Governor, as shown by the letters, received the expediente and directed that Villareal, with other persons named, appear at his office for the receipt of title. The forwarding of Villareal's expediente to the Governor would reasonably afford the presumption that he had paid for the land to which it related. Haynes v. The State, 100 Texas, 426, 100 S. W., 912. Independently of the official letters, it was found by the Court of Civil Appeals that the Abajo was surveyed for Villareal in 1832 by Canales, Surveyor General of Tamaulipas. It was proved conclusively that Villareal was in possession of the Abajo until 1850 or 1860. These facts in connection with the letters show, at least circumstantially, that the land referred to in the letters as surveyed for Villareal, paid for by him and to which his right was recognized by the Mexican authorities, was the Abajo Survey. At all events, while the proof is not clear, we think that under it this holding is more in consonance with right and fairness than would be a contrary one.

With respect to the State's contention that if Villareal acquired an inchoate right to the land he thereafter abandoned it, there was not shown any unequivocal act on his part evidencing such an intention. A mere failure to assert his right could not operate as a forfeiture of it. Besides, this was a question of fact, concluded by the judgment of the trial court; and as we have held upon the other fact questions, we will not review it.

The holding of the trial court that the Fant Heirs and the purchasers from the State were purchasers for value of their respective sections without notice of the inchoate right of Villareal, should in our opinion be also sustained. There is hardly room for controversy upon this question. The grant issued Villareal being void, its record with the field notes accompanying it in Cameron County, or the filing of a copy of it and the field notes in the Land Office afforded, of course, no character of notice. The re-survey by Cocke of the Abajo at the instance of Crafts was based upon the void grant. It was hence wholly without authority, and the filing of the field notes could not, therefore, operate as notice. Whatever actual knowledge F. J. Parker, the predecessor in title of the Fant Heirs, had of Villareal's right, even if diligently pursued, would have led only to the ascertainment of the void grant. But any notice to him would not affect purchasers under him if they were innocent. Holmes v. Buckner, 67 Texas, 107. His deed to the Driscolls and Fant and the deed of the Driscolls to Fant, the ancestor of the Fant Heirs, which referred to the Villareal Grant, expressly contradicted the existence of any right in Villareal, by the recital that the land had been forfeited to the State. The only actual notice of anything in relation to Villareal's right had by those claim-

ing under the State was of the maps in the Land Office, upon which was indicated a survey of the Abajo for Villareal. But there is nothing whatever to show that those maps had any relation to Villareal's equitable right, or that they were referable to any title of Villareal's save that which the void grant purported to evidence. Inquiry produced by everything in the case having any character of actual notice would have led inevitably, we think, only to the void grant shown to be void upon its face. Crafts, the attorney for Villareal, who was instrumental in filing the grant for record in obtaining a re-survey of the Abajo and in thus affording evidence of Villareal's right, was not shown to have had any knowledge of the equitable right in Villareal, or of any right except that founded on the void grant. Inquiry of him would have given no knowledge in any way concerning Villareal's equitable right. Nobody, it appears, had any knowledge of the letters, without which there was no evidence of any right at all in Villareal, until 1904, when Pierce after prolonged search discovered them in the town of a foreign country. It is not to be held that those holding under the State were under the duty of searching through the records of ancient towns of a foreign country for evidence of an adverse right, which was only discovered, long after their rights accrued, by extraordinary effort. There can be no presumption of notice where an inquiry pursued with ordinary diligence would have been futile. Slayton v. Singleton, 72 Texas, 209. Those now claiming the land against the State and the holders of its title permitted the meager and fragmentary evidence of their right to slumber for more than seventy years in the buried records of a foreign jurisdiction. With no possession on their part, with the land vacant, and the State's claim openly asserted by appropriation at an early day, its resurrection now should not be suffered to defeat the title of innocent settlers who bought from the State in good faith.

There is no question as to full value having been paid for the Fant title. The purchasers from the State had not paid the full money consideration at the time when from this controversy they first learned of Villareal's inchoate right. But they had all long before completed their settlement upon the land. This was the chief part of the consideration to the State in its sale of the land to them. They had therefore paid the principal part of the consideration. They had also improved the land. The claimants of the Villareal right made no offer to requite them for the consideration paid, or for their improvements, or in any way perform what equity would in any event require at their hands. With this true, they are in no position to complain of the judgment protecting the rights of these purchasers in their sections by an award of such sections to them, or of the protection of the right of the State to the balance of the purchase money due on them.

When the land was surveyed for the State and under the Parker, certificate there was no evidence in the Land Office or elsewhere within the State of any appropriation of it in the right of Villareal save that which was referable alone to the Mexican grant, which was void upon its face. An appropriation void upon its face cannot, in its very nature, give land the character of "titled land" or "land equitably owned" within the contemplation of Section 2, Article 14 of the Constitution.

The right of the entire case was in our opinion attained by the trial court. Its judgment and the judgment of the Court of Civil Appeals are affirmed.

*Affirmed.*