**Robert D. JONES and wife, Kathryn Jones, Appellants,**

v.

**P.A.W.N. ENTERPRISES, A Limited Partnership, et al., Appellees.**

No. 07–98–0022–CV

Court of Appeals of Texas, Amarillo.

Feb. 10, 1999.

Lemon, Shearer, Ehrlich, Phillips & Good, Mitchell Ehrlich, Perryton, for appellants.

Underwood, Wilson, Berry, Stein & Wilson, Edward H. Hill, James W. Wester, Amarillo, for appellees.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

JOHN T. BOYD, Chief Justice.

This appeal arises out of an action to quiet title on a 120–acre tract of land in Lipscomb County. In two points, appellants Robert Jones and his wife Kathryn Jones (the Joneses) assert the trial court erred in rendering a judgment declaring appellees[1] the

---

**1.** The prevailing parties to the trial court's judgment were: P.A.W.N. Enterprises, Frank T. Fleet, Inc., Frank T. Fleet, as trustee of the Margaret Helen Kalmar Children's Trust A, Me- kusukey Oil Company, Inc., Neva P. and Nevin Cooper as trustees of the Neva P. Cooper Trust, Par Oil Company, Inc., William C. Cook, David Thomas Cook, Harry Carver, George Carver, Key

owners of one-half of the mineral interest in the disputed tract, and awarding attorney's fees to the prevailing parties. In those points, the Joneses assert 1) the trial court erred in refusing their motion for partial summary judgment and in granting appellees' motion for partial summary judgment; and 2) in awarding attorney's fees to appellees. For reasons we later state, we affirm the judgment of the trial court.

A proper consideration of the issues raised in this appeal requires a somewhat detailed recitation of the convoluted facts giving rise to the dispute. The underlying suit grows out of a long history of confusion concerning the location of the boundary between the eastern edge of the Texas Panhandle and the main western edge of the present State of Oklahoma. The fact that this boundary runs along the 100th meridian has never been in dispute. Indeed, that boundary was established as early as 1819 in a treaty between the United States and Spain. *See Oklahoma v. Texas*, 272 U.S. 21, 47 S.Ct. 9, 71 L.Ed. 145 (1926). The treaty made specific reference to the Melish map published in Philadelphia.[2] The description of the boundary as being at the 100th meridian was followed in an 1828 treaty with Mexico, the Convention of 1838 between the United States and the Republic of Texas, and the federal statute admitting Texas to the Union in 1845. *Id.* As in the saying, "the devil is in the details," the boundary disputes have been about the location of the 100th meridian on the ground.

The first survey to mark the location of the 100th meridian on the ground was undertaken by A.H. Jones and H.M.C. Brown at the direction of the Commissioner of Indian Affairs. *Wortham v. Walker*, 133 Tex. 255, 128 S.W.2d 1138, 1142 (1939). This survey was retraced and extended to the north in 1860 by John H. Clark. The result of these efforts became known as the Jones–Brown–Clark line. *Id.* The line determined in these surveys, and marked with monuments, was significantly west of the location indicated in the Melish map. Some of the monuments created during these surveys were moved as a result of additional surveys conducted by the United States between 1872 and 1875. *Oklahoma*, 272 U.S. at 28, 47 S.Ct. 9.

When the Texas Legislature established Lipscomb, Hemphill, Wheeler, Collingsworth, and Childress Counties in 1876, it defined their eastern boundaries as the 100th meridian as marked by the monument placed during the Jones–Brown survey. 3 Sayles, Early Laws of Texas, art. 4285. In 1892, Texas hired H.S. Pritchett to located the 100th meridian on the ground. *Wortham*, 128 S.W.2d at 1142. Pritchett located the meridian line 3797.3 feet east of the Jones–Brown–Clark line. *Id.* In an 1896 opinion of the United States Supreme Court, the Court determined that Oklahoma's southeastern boundary with Texas ran along the south fork, or Prairie Dog Town Fork, of the Red River. *United States v. Texas*, 162 U.S. 1, 16 S.Ct. 725, 40 L.Ed. 867 (1896). While that case did not determine the true location on the ground of the 100th meridian, it clearly stated that the boundary was established by the true location of the meridian, rather than a location determined by an erroneous survey or map. 162 U.S. at 42, 16 S.Ct. 725; *Oklahoma*, 272 U.S. at 39–40, 47 S.Ct. 9.

Still another survey was commissioned by the federal government and was performed by Arthur D. Kidder in 1902. Kidder found the meridian to be along a line 3699.7 feet west of the south marker of the Jones–Brown–Clark line and 97.6 feet east of the Pritchett line. *Oklahoma*, 272 U.S. at 32, 47 S.Ct. 9; *Wortham*, 128 S.W.2d at 1143. The northern end of the Kidder line was 743.16 feet east of the Jones–Brown–Clark line. Kidder erected a monument to mark the northern and southern ends of the line as surveyed by him. The Texas Legislature adopted the southern monument erected by Kidder as marking the true location of the

Enterprises, Inc., Maxine Jarvis Dougherty, Patricia Johnston Adams as executrix of the Estate of Norma M. Johnston, Menor Whitney Company, Ad Astra Foundation and Blair Royalties, Ltd. For clarity, we will refer to these parties collectively as P.A.W.N. or the P.A.W.N. defendants. Enron Oil & Gas filed an interpleader action because it held the royalty payments for previous production.

2. This map is reproduced in the court's opinion in *United States v. Texas*, 162 U.S. 1, 30, 16 S.Ct. 725, 40 L.Ed. 867 (1896).

100th meridian on the ground. Act of Apr. 30, 1903, 28th Leg. 1st C. S., ch.7, § 2 1903 Tex. Gen. Laws 12, 14.[3]

In 1909, the State of Oklahoma patented 172 acres in Ellis County, Oklahoma to Francis Smith. It is the title to a portion of this property which gives rise to the present litigation. Allen S. Starbuck acquired this property in 1920. In November 1919, Oklahoma filed suit against Texas seeking a determination of the southern boundary along the Red River between the two states. *Oklahoma v. Texas,* 272 U.S. at 23, 47 S.Ct. 9. In the suit, Texas counterclaimed seeking a determination of the true location on the ground of the 100th meridian. *Id.* During this litigation, a 1923 survey was made which determined the line to be 371.5 feet east of the Kidder monument. *Id.* at 38, 47 S.Ct. 9. The United States Supreme Court rendered its opinion in the case on October 11, 1926. *Id.* In that opinion, the Court found the Texas Legislature's reference to the Jones–Brown monuments in establishing the counties along the disputed boundary to be merely descriptive, and those monuments did not establish the true location of the 100th meridian on the ground. *Id.* at 44, 47 S.Ct. 9. The Court also held there was no period of time when the parties involved, namely the United States, Texas, or Oklahoma had recognized, and acquiesced in, the Jones–Brown–Clark line as establishing the true boundary between Texas and Oklahoma. *Id.* at 46, 47 S.Ct. 9. Finally, the Court rejected each of the previous lines and monuments as authoritative, directed the appointment of a commissioner to locate the true boundary on the ground, and appointed Samuel S. Gannett as commissioner to perform that task. *Id.* at 49, 47 S.Ct. 9. *Oklahoma v. Texas,* 273 U.S. 93, 47 S.Ct. 307, 71 L.Ed. 555 (1927).

Subsequent to this decision, but before the adoption of a new line, there were several conveyances affecting the disputed property. By warranty deed dated November 16, 1927, Allen Starbuck conveyed one-half of the mineral interest in the property before us to E.W. Wasson. The parties refer to this deed as mineral deed number 1. On June 16, 1928, by another warranty deed, Wasson conveyed this interest to D.F. Fleet, John Fleet, and W.H. Osborn. This is referred to as mineral deed number 2. On August 18, 1928, also by warranty deed, the Fleets and Osborn conveyed a one-fourth mineral interest to E.W. Whitney. This is referred to as mineral deed number 3. Appellees are the successors to these mineral interests.

In 1929, the Texas Legislature enacted Article 5421a of the Revised Civil Statutes Annotated (Vernon 1962). The statute provided that if the Supreme Court decision in *Oklahoma v. Texas* resulted in the award of additional land to Texas, the boundaries of the respective counties would be extended to the newly determined state boundary. The act also prohibited the sale of such land until authorized by the legislature.

The Gannett report was adopted by the Supreme Court on March 17, 1930. *Oklahoma v. Texas,* 281 U.S. 109, 50 S.Ct. 247, 74 L.Ed. 731 (1930). In its order, the Court fixed the south end of the boundary at a point on the south bank of the Red River 4071.2 feet east of the Jones–Brown monument. *Wortham,* 128 S.W.2d at 1144. This point was 371.5 feet east of the Kidder monument and was the same point found by the 1923 survey.

In 1931, the 42nd Texas Legislature enacted Senate Bill 481. Act of May 21, 1931, 42nd Leg., R.S., ch. 185, 1931 Tex. Gen. Laws 311. That Act currently appears as Article 5330a of the Texas Revised Civil Statutes Annotated (Vernon 1962). This law, referred to as the title curative legislation, created a procedure for "claimants," that is, those who would have owned the land had it been located in Oklahoma, to receive patents in that land from Texas. Because of its relevance to

---

3. Curiously, despite this legislation, in 1912, this court declined to reverse the denial of a petition for mandamus seeking to compel a county surveyor to survey land "east [ ] by 3,600 or 3,700 feet reckoned from the 'Jones–Brown initial monument.' " *Wortham v. Sullivan,* 147 S.W. 702, 703 (Tex.Civ.App.—Amarillo 1912, writ dism'd). However, soon thereafter, Texas did issue patents to Wortham for a section of land between the Jones–Brown line and the Kidder line. *Wortham v. Walker,* 128 S.W.2d at 1143.

our decision, we set out below the pertinent portions of the statute:

Sec. 1. All of the lands [ ] found to be in the State of Texas by the final decree of the Supreme Court of the United States, entered March 17th, 1930, in the case of the State of Oklahoma vs. the State of Texas, [ ] theretofore claimed by Oklahoma but now located in Lipscomb, Hemphill, Wheeler, Collingsworth and Childress Counties, are hereby offered for sale to the claimants of said lands as reflected by the Deed Records or other public records of the State of Oklahoma and under the laws of the State of Oklahoma at the time of the rendition of said decree [ ] and said lands shall be sold to such claimants as would have then owned said lands had the same been a part of Oklahoma, [ ]. The consideration for such sale shall be the sum of One ($1.00) Dollar per acre.

Sec. 2. The rights and duties of the Special Land Board are transferred to the General Land Office, and the Special Land Board is abolished. [note—Section 2 of the original Act created the Special Land Board to determine who was entitled to purchase the lands under the Act]. The General Land Office shall have the power to [ ] make such surveys and investigations as may be necessary to carry out the provisions of this Act, and to adopt such rules, regulations and forms as it may deem expedient.

Sec. 3. Any claimant to any portion of said lands who would have had title to same had it been located in Oklahoma, may make application to the Commissioner of the General Land Office to purchase the land claimed. [I]n event it is found that the applicant would have been the owner of said land at the time of the decree of the Supreme Court of the United States had the same been located in Oklahoma, [ ] such application shall be approved, and said land awarded to said applicant. [U]pon receipt of such payment the Commissioner of the General Land Office shall issue to the claimant a patent to said lands in such form as the Land Commissioner shall prescribe.

Sec. 4. In event the claimant fails or refuses to purchase same or to apply for a patent as provided for herein, then the holder of a lien against any of said lands may make such purchase or apply for such patent on behalf of said owner and pay the consideration provided for, and all fees and expenses [ ]. The patent issued upon application and purchase of a lien holder shall be in the name of the person, persons or company who would have owned said lands had the same been a part of Oklahoma.

Sec. 5. All deeds, mortgages, contracts and instruments of every nature, [ ] affecting the title to said lands, or that would have formed a part of the chain of title to the same under the laws of the State of Oklahoma, may be filed and recorded in the county in Texas in which the land is now located. All deeds, mortgages, conveyances and all other instruments which would be valid under the laws of the State of Oklahoma and admissible in evidence under the laws of said State, shall be valid in Texas and shall be admissible in evidence in any court in this State[.] All such deeds, deeds of trust, mortgages, conveyances and contracts, affecting the title to any of said lands shall be given the same force and effect in the State of Texas as same would have been given in the State of Oklahoma, and all bona fide liens, incumbrances (sic), or debentures, now outstanding and unsatisfied, and existing against said lands at the time of the rendition of said decision of the Supreme Court of the United States are here expressly validated, save and except as to purchase money due to the State of Oklahoma, or the United States, and except taxes[.]

\* \* \*

Sec. 7. The Land Board, upon the passage of this Act, is authorized to determine when such lands are available for purchase, and said Board shall by proper proclamation give notice to all persons desiring to file an application to purchase said land, by causing such proclamation to be published once each week for two consecutive weeks in some newspaper of general circulation in each county in which any

part of said lands may be located, and by filing a copy of such proclamation with the County Clerk of each such county. Applications to purchase such lands shall be filed with the Commissioner of the General Land Office within four months from and after the last publication, and if said claims are not filed within said time an additional filing fee of Ten (10) Cents per acre shall be required. No land shall be patented or sold under the provisions of this Act unless claimed and applied for within twelve months after the publication of said proclamation, and the publication shall so state.

Allen S. Starbuck died in 1933 without having obtained a patent from the State of Texas. His right to apply for a Texas patent passed to his children. Pursuant to Section 4 of Article 5330a, the lien holder on the property, the Federal Land Bank of Wichita, Kansas, applied for, and obtained, a patent on the land claimed by the Starbucks. That patent was issued in the name of Allen S. Starbuck on February 5, 1942. The copy of this handwritten patent which appears in the record is, for the most part, illegible; however, it appears to grant all the surface and mineral estate except a one-sixteenth non-participating royalty interest reserved by the state. In 1944, again by warranty deed, one of Allen S. Starbuck's children, Allen W. Starbuck, acquired the interests of his siblings subject to the royalty interest reserved to the State of Texas. Although the grantees of the Oklahoma mineral deeds did not apply for a patent from Texas, in accordance with Section 5 of Article 5330a, mineral deeds numbers 1 and 2 were filed in the deed records of Lipscomb County in 1945 and 1946 respectively. In 1971, Allen W. Starbuck's interest was purchased by his son, Thomas L. Starbuck.

In 1976, Thomas L. Starbuck executed a warranty deed purporting to convey the entire estate, subject only to Texas's reserved royalty interest to the Joneses, appellants herein. It was not until 1995 that mineral deed number 3 was filed in Lipscomb County and appellees asserted title to one-half of the minerals in the 120-acre tract with which we are concerned. The Joneses filed this underlying suit seeking to quiet their title to the tract. The parties filed opposing motions seeking summary judgment and partial summary judgment.

The basis on which appellees sought summary judgment was a recitation of the events since 1909 concerning the land, coupled with the following conclusory paragraph:

Under and by virtue of (a) the mineral grant from Allen S. Starbuck and wife as alleged in paragraph 3 hereinabove including the general warranty of title as therein set forth, (b) the subsequent patent to Allen S. Starbuck [ ] (c) the mesne conveyances [to the P.A.W.N. defendants], and (d) the stipulation described in paragraph 3.5 of Plaintiffs' First Amended Original Petition as recorded in the deed records of Lipscomb County, Texas, defendants/counterclaimants P.A.W.N. Enterprises, et al., became owners in the undivided one-half interest conveyed by the aforesaid mineral grant from Allen S. Starbuck and wife to E.W. Warren.

Paragraph 3.5 of the plaintiffs' first amended original petition merely states that in a "purported stipulation of interest and cross-conveyance dated July 15, 1994" recorded in the deed records of Lipscomb County, appellees claim title to one-half of the mineral interest in the property. The parties have failed to identify a copy of this document in the record. The motion presented no additional argument or authority in support of or explanation of the reference to the stipulation.

Without stating the grounds for its ruling, the trial court granted appellees' motion for partial summary judgment declaring that they were the owners of one-half of the mineral interest in the disputed property and were entitled to royalty payments from Enron. The issue of attorneys' fees was tried to a jury. In response to the jury's answers, the trial court awarded appellees' attorneys' fees of $6,500 through the date of judgment, $2,500 on appeal to this court, and $1,250 in the event of a petition seeking review to the Texas Supreme Court and a like amount of $1,250 if such a petition is granted.

In their first point, the Joneses assert several arguments challenging the partial summary judgment. In reviewing those

challenges, we must bear in mind that a summary judgment is only proper when a movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex. 1995); Tex.R. Civ. P. 166a(c). In deciding whether there is a material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true and every reasonable inference resolved in its favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Where, as here, the trial court's order granting summary judgment does not specify the ground or grounds relied upon, the judgment is to be affirmed if any of the theories advanced by the movant are meritorious. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996).

In response to the Joneses' arguments, the P.A.W.N. defendants initially cite the rule stated in the *Cincinnati Life* case that we must consider all the grounds and theories advanced in their motion. However, in their motion, other than asserting that the facts they recited were sufficient to entitle them to judgment, appellees did not state any specific grounds or theories. The Joneses have proceeded on the theory that appellees sought their judgment on the basis of after-acquired title and we will likewise consider whether that argument is sufficient to justify the trial court's judgment.

### The Title Curative Legislation

■ The Joneses' first argument, on which they place considerable emphasis, is that Section 3 of Article 5330a, the title curative legislation, makes no distinction between claimants of the surface estate and claimants of the mineral estate. Thus, they reason, the statute required each person who claimed an interest to "any portion" of the land to make their own application for a patent from the State of Texas. They maintain that any other construction of the statute would be "unreasonable." Therefore, they conclude, because appellees failed to make application

for patents for their mineral interests, they lost those interests.

However, that argument is answered by reference to the rules and regulations adopted by the Special Land Board before it was abolished and its functions transferred to the General Land Office. Section 2 of the original version of Article 5330a established the Special Land Board and authorized it to adopt governing rules. Those rules required an examining attorney to certify to the Board that an applicant was eligible to apply for a Texas patent by virtue of being the title holder of record in Oklahoma. Rule 13 provided that the Oklahoma title holder was the only person who could make application to purchase the land and the only person in whose name a patent could be issued. Importantly, Rule 16 declared "the examining attorneys are to look only to the owners of the surface in certifying as to the name of the Oklahoma record owner on March 17, 1930." These rules [4] precluded the holders of mineral interests alone from making application for, or obtaining, a patent. Consequently, the failure of the mineral owners to obtain a patent from the State of Texas does not prevent them from claiming that interest. Significantly, the Joneses have not challenged the validity or applicability of these rules.

### The Doctrine of After–Acquired Title

■■ The Joneses next argue that appellees could not have obtained title to the one-half mineral interest by the doctrine of after-acquired title. That doctrine has a long history in Texas. *See, e.g., Davis v. Agnew,* 67 Tex. 206, 2 S.W. 376, 378 (1886). The rule, which is a part of the law of estoppel, was applied and explicated in *Clark v. Gauntt,* 138 Tex. 558, 161 S.W.2d 270 (1942), in which the court stated:

It is a general rule, supported by many authorities, that a deed purporting to convey a fee simple or a lesser definite estate in land and containing covenants of general warranty of title or of ownership will operate to estop the grantor from asserting an

**4.** The record suggests, but does not clearly establish, that Rules 13 through 16 were adopted in 1940.

after-acquired title or interest in the land, or the estate which the deed purports to convey, as against the grantee and those claiming under him.

*Id.* 161 S.W.2d at 271. The estoppel effect of the after-acquired title doctrine is binding upon subsequent purchasers with notice from the prior grantee. *Davis v. Field,* 222 S.W.2d 697, 700 (Tex.Civ.App.—Fort Worth 1949, writ ref'd n.r.e.). The filing of the prior deed is constructive notice to subsequent purchasers. *Dyson Descendant Corp. v. Sonat Exploration Co.,* 861 S.W.2d 942, 947 (Tex.App.—Houston [1st Dist.] 1993, no writ).

The Joneses' initial contention that the doctrine of after-acquired title does not apply in this case is based upon their interpretation of the hoary case of *Lamb v. James,* 87 Tex. 485, 29 S.W. 647 (1895). They argue that the case stands for the proposition that because of the state's vital interest in protecting its citizens, the usual rules pertaining to private property do not apply in an attempted conveyance of public lands, *i.e,* the doctrine of after-acquired title does not apply in such instances. The Joneses' strong reliance upon the case justifies the examination of the facts before the court at the time of its decision.

In 1885, Still[5] applied to the Texas Land Board to purchase certain realty owned by the state as agricultural land. The land was awarded to him and he made a small down payment and executed notes for the remainder of the purchase price. However, the court noted, he never acquired any interest in the property because he never became an actual settler on the land and the land was not sold in the county or district in which it was situated. *Id.* 29 S.W. at 648. Nevertheless, he gave a warranty deed to James, who assumed the payment of the purchase notes, but never took possession of the land. James subsequently gave a warranty deed to Lamb and Edwards and, as a part of the consideration for the conveyance, the grantees assumed the payment of the original notes and executed four additional notes pay-able to James. At the time Lamb and Edwards purchased the land, they knew there was some question about the regularity of the Still purchase, but they believed they were getting good title. *Id.* Lamb and Edwards moved on the land and became actual settlers. *Id.* Edwards subsequently conveyed his interest to Lamb, who assumed the payment of all the notes.

After Lamb also acquired Edwards's interest, he learned he had actually not acquired any title and that the land was still in the public domain. He made application to the Land Board for the land and was awarded it at additional expense to him. Lamb then sought to cancel the notes given to James and to recover the additional expenses he had been out in curing his defective title. *Id.* Thus, the question before the court was whether Lamb was entitled to recover from James only the additional expense he incurred in curing his defective title, the established general rule in such situations, or was he also entitled to recover the cash down payment he had paid James? *Id.* 29 S.W. at 648–49. Declaring the attempted conveyance of public land wholly void as against public policy, the court held that Lamb was entitled to recover from James his cash payment and to a cancellation of the purchase money notes[6] which he had given James. Thus, the actual question before the court was the measure of damages for the breach of a warranty of title. En route to allowing its recovery, the *Lamb* court held that a conveyance of title in derogation to public rights is wholly void. The Joneses argue that applying the teaching of the case here, because the 120–acre tract was later determined to be part of the Texas public lands, any conveyances based upon the Oklahoma title were also wholly void.

The Joneses next argue that their asserted holding of *Lamb* was followed in *Davis v. Field, supra.* They contend that the *Davis* court held that the doctrine of after-acquired title did not apply because "the attempted conveyance of minerals of the land [ ] before

---

5. The opinion does not reveal anything other than his last name.

6. The notes had been purchased by the Panhandle National Bank, but the court noted that the bank "had notice of the fact above," *i.e.,* the defect in the Still title.

securing a patent was an attempt to convey part of the land itself which still belonged to Texas and was in derogation of the State's rights." Again, that contention requires a detailed consideration of the case.

In *Davis*, S.D. Hughes settled on a tract of land in an effort to obtain a patent from the state. Before the required period of residence on the land was completed, Hughes executed a document purporting to convey a one-half mineral interest in the land to William Fanning *et al.* Hughes then quitclaimed his rights in the land to A. Mobley without mentioning the attempted mineral conveyance. Based upon the prior occupancy of the land by Hughes, and his continued occupancy, Mobley completed the required residence period and acquired a patent to the land. Fanning's successors to the purported mineral interest transfer asserted title to that interest under the after-acquired title doctrine.

In addressing that claim, the court focused on the requirement of the after-acquired title doctrine that the grantor "expressly or impliedly represent [by the deed] that he held title to the land conveyed." 222 S.W.2d at 700. The court noted that in the instrument in question:

> [Hughes] did not represent himself as the owner, but only as one holding pre-emption rights and expecting later to acquire a patent. The grantees in the mineral deed, being charged with knowledge of the law, knew that Hughes had no right to make them a present conveyance of the minerals, and they, as well as Hughes, knew that any severance of minerals before issuance of the patent would be in fraud of the State's rights in the land.

*Id.* at 701. It was on that basis that the court held that the after-acquired title doctrine did not apply. In this case, Allen S. Starbuck's 1927 deed contained warranties of title.

The Joneses also cite *Breen v. Morehead*, 104 Tex. 254, 136 S.W. 1047 (1911). In that case, the State of Texas awarded the right to purchase a section of land to Marshall Rogers subject to an obligation to pay the purchase price as agreed upon. In 1885, prior to the time his title was perfected and a

patent issued, Rogers conveyed an undivided one-half interest in the tract to John Julian, and the remaining one-half interest to M.J. McKelligon, both by quitclaim deeds. Also in 1885, McKelligon quitclaimed one half of his one-half interest "in three hundred twenty acres" to Patrick Breen. Because of default in payments due the state in 1885 and 1886, Rogers's award was forfeited. *Id.* 136 S.W. at 1047.

Learning of the forfeiture, McKelligon filed his application to purchase the land and was awarded the right to purchase it. In 1890, because McKelligon had completed all prior requirements, the land was patented to him. Later, by a series of warranty deeds executed subsequent to the time of his patent, McKelligon and his wife conveyed a total of 600 acres of land to P.E. Kern and 40 acres to Ella Agnes McKelligon. *Id.* 136 S.W. at 1047–48. As relevant here, Patrick Breen intervened, seeking affirmation of his title to the land quitclaimed to him by McKelligon.

In disposing of Breen's claim, the court held that his title was derived through Rogers's right to purchase the land. Because the State's forfeiture of Rogers's award for failure to comply with the legal requirements was valid and occurred prior to the issuance of a patent on the land, that forfeiture terminated any right to the land Breen may have had. *Id.* 136 S.W. at 1048–49. The court then discussed whether purchasers for value from McKelligon subsequent to the date of the patent had a duty to look beyond the date of the origin of McKelligon's title, *i.e.*, the date of the award to him which matured when his patent was issued. Citing a treatise on real property and another on equity, the court concluded that a purchaser had no such duty to look beyond the date of the origin of McKelligon's title. *Id.* That rule has been followed by our courts. *See, e.g.*, *Cherry v. Farmers Royalty Holding Co.*, 138 Tex. 576, 160 S.W.2d 908, 911 (1942); *Williams v. Cook*, 282 S.W. 574, 575 (Tex. Com.App.1926, opinion adopted). The Joneses conclude that this holding is applicable here because, they reason, appellees' title depends upon conveyances prior to origin of the Texas title. Thus, they conclude their

predecessors in title had no chargeable notice of those prior conveyances.

■ Without citation of relevant authority, appellees contend that the *Lamb–Davis–Breen* holdings are not applicable because at the time of Allen S. Starbuck's mineral conveyance, he "was fully vested in the land [ ] under the laws of the State of Oklahoma." However, every case we have discovered on the question compels the conclusion that Starbuck did not have a vested right.

For example, *Coffee v. Groover*, 123 U.S. 1, 8 S.Ct. 1, 31 L.Ed. 51 (1887), dealt with the effect of the resolution of a boundary dispute on private property rights. In that case, both Georgia and Florida had granted title to the same land located on their common boundary. It appeared that Georgia had also exercised governmental powers over the land. The two states settled their boundary dispute by adoption of a line north of the disputed property which placed it in Florida. The suit arose because of a dispute as to which state's grant was determinative. The Georgia claimants argued, in the words of the court, "that grants in a disputed territory, by a government exercising therein sovereign jurisdiction *de facto*, are valid and to be sustained, notwithstanding that, by a subsequent settlement of boundaries, the disputed territory is conceded to the other contesting sovereign." 123 U.S. at 7, 8 S.Ct. at 4, 31 L.Ed. at 55. En route to its holding that the Georgia grants were not valid, the court noted:

> It is no doubt the received doctrine, that in cases of ceded or conquered territory, the rights of private property in lands are respected. Grants made by the former government, being rightful when made, are not usually disturbed. Allegiance is transferred from one government to the other without any subversion of property.

> ⁕ ⁕ ⁕

> But whilst this is the acknowledged rule in cases of ceded, and even conquered territory, with regard to titles acquired from a former sovereign who had undoubted right to create them, it does not apply (as we shall see) to cases of disputed boundary, in relation to titles created by a sovereign in possession, but not rightfully so.

123 U.S. at 7–11, 8 S.Ct. at 4–6, 31 L.Ed. at 55–56. The court characterized the exercise of governmental powers without vested authority as being *de facto* government and, because Georgia's possession was merely *de facto*, its attempted conveyances of public lands were invalid. 123 U.S. at 30–31, 8 S.Ct. at 16–17, 31 L.Ed. at 63. *See also Henderson v. Poindexter's Lessee*, 25 U.S. (12 Wheat) 530, 6 L.Ed. 718 (1827); and *Garcia v. Lee*, 37 U.S. (12 Pet.) 511, 9 L.Ed 1176 (1838).

The rule was followed in *Kenedy Pasture Co. v. The State of Texas*, 111 Tex. 200, 231 S.W. 683 (1921). The issue in that case was the validity of 1848 grants from the Republic of Mexico to land situated between the Nueces and Rio Grande Rivers. The court noted that since the Texas revolution, the boundaries of both the Republic of Texas and the State of Texas always extended to the Rio Grande. Thus, the exercise by Mexico of governmental powers to the Nueces River were only *de facto*, which gave it no title to the land and no right to convey any title. *Id.* 231 S.W. at 690. The court went on to note that "considerations of policy and justice of course require of a *de facto* government the preservation of order and the adjustment of private rights and claims against individuals" and such acts are valid; however, the acts of a *de facto* government in matters affecting public rights such as the conveyance of public lands are void. *Id.* 231 S.W. at 691.

The same rule was applied by the court in *Wortham v. Walker, supra.* As we have noted, that case also involved the location on the ground of the 100th meridian. At issue was the validity of patents issued by the United States government before the true line of the eastern boundary of the Texas Panhandle was established by the supreme court decision. Relying extensively upon the United States Supreme Court's decision in *Coffee v. Groover, supra*, the court held the federal government's authority over land located west of the true boundary was only *de facto* which conferred no authority to convey land. 128 S.W.2d at 1144–45. Parenthetically, the court opined that the only remedy possessed by the federal grantees was

against the federal government, not the rightful title holders. *Id. 128 S.W.2d* at 1146.

Because the land in question here has always been a part of the State of Texas (and formerly the Republic of Texas), it is clear from these authorities that the exercise of governmental power over this land by the federal government and then the State of Oklahoma was, at most, the act of a *de facto* government, and gave them no right to convey valid title. Thus, because it had no valid title to convey, Oklahoma's purported grant to Allen S. Starbuck's predecessor, Smith, passed no title. That being so, Starbuck's rights to the land could not be, and were not, "fully vested" as contended by appellees.

■ However, that decision does not end our task because we must now decide the effect of Article 5330a upon these otherwise ineffective deeds. Section 5 of the statute provided that "[a]ll deeds, mortgages, conveyances and all other instruments which would be valid under the laws of the State of Oklahoma [ ] shall be valid in Texas [ ]" and that such deeds "shall be given the same force and effect in the State of Texas as [they] would have been given in the State of Oklahoma." Tex.Rev.Civ. Stat. Ann. art. 5330a, § 5 (Vernon 1962). The statute also authorized the recording of those instruments in the Texas county in which the land was located. *Id.* Parenthetically, this procedure is not entirely unique. Section 12.004 of the Texas Property Code (Vernon 1984), authorizes the recording of copies of deeds affecting title in Texas even if the original was filed in another state.

In its discussion of the general rule that grants from a *de facto* government fail for want of title in the grantor, the United States Supreme Court noted an exception for grants "confirmed by proper stipulations." *Coffee, supra.* That statement appears to be an endorsement of the very type of statute as that before us. As we have noted above, pursuant to authority granted by Section 2 of the original version of article 5330a, the Special Land Board adopted Rule 16 which effectively prohibited mineral interest owners from seeking their own patent from Texas. As a result, the only way a mineral interest owner could make their deeds effective, and

fulfill the clear purpose of the statute, was to follow the procedure set out therein and record the deeds in the proper Texas county. The record establishes that this is what appellees' predecessors did.

■ With regard to the Joneses' contention that because the title to appellees' mineral interest depends upon conveyances made prior to the Texas patent, they were not charged with notice of those conveyances, the case of *Leonard v. Benford Lumber Co.,* 110 Tex. 83, 216 S.W. 382 (1919), is instructive. In that case, the court imputed to a grantee knowledge of recorded instruments affecting title to land executed prior to the patent from the State of Texas because those instruments were the origin of title to the land and matured in the issuance of a patent on the property. In doing so, the court expressly held that its opinion did not conflict with that of the *Breen* court. It explained that *Breen* held that "a purchaser need not look beyond the origin of the title under which he purchased" which, it noted in *Breen,* was the date of the application to buy the land from the state. *Id.* 216 S.W. at 383. In *Leonard,* the origin was in a donation certificate issued to Lewis Cox by the state for his services in the battle of San Jacinto. *Id.* Thus, recorded conveyances of the rights conferred by that certificate, issued before 1860, were effective as notice to buyers of the land after the patent issued in 1908. We have found nothing that undermines the continued efficacy of that rule.

Applying the rule to the facts before us, it appears clear that the origin of Allen S. Starbuck's Texas title was, by virtue of Article 5330a, his otherwise void Oklahoma title. We believe this is correct because Section 3 of the article expressly based his right to acquire a Texas patent upon the fact that he would have had title to the land had it been located in Oklahoma. That reasoning is required to give full effect to section 5 of the article.

■ We may presume that the legislature has not done a useless act. *Liberty Mut. Ins. Co. v. Garrison Contractors,* Inc., 966 S.W.2d 482, 485 (Tex.1998). We also presume that it was aware of prior decisions of

our courts. *Acker v. Texas Water Com'n,* 790 S.W.2d 299, 301 (Tex.1990). By definition, all deeds "that would have formed a part of the chain of title [in] Oklahoma," were executed before any Texas patent to the land. Consequently, unless our application of the rule explicated in the *Breen* case and reaffirmed in the *Leonard* case is correct, Article 5330a would be without effect in the case of mineral interest owners.

▮ Because everyone is charged with knowledge of the law, *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 n. 3 (Tex.1990), the Joneses are charged with knowledge of Article 5330a. That statute gave notice that 1) patents along the eastern border of the Panhandle may have had their origin in Oklahoma deeds, and 2) county deed records could contain deeds executed in Oklahoma before issuance of a Texas patent. The obligation to search those records is not onerous because after recordation in 1945, the mineral deeds showing an outstanding mineral interest would appear in the grantor-grantee index of the deed records of Lipscomb County under the name of Allen S. Starbuck. A proper title search includes examination of the grantor-grantee indices. *See First Southern Properties, Inc. v. Vallone,* 533 S.W.2d 339, 340 (Tex.1976); *Lone Star Gas Company v. Sheaner,* 297 S.W.2d 855, 858 (Tex.Civ.App.—Waco 1956), *reversed in part,* 157 Tex. 508, 305 S.W.2d 150 (1957); *Reserve Petroleum Co. v. Hutcheson,* 254 S.W.2d 802, 806 (Tex.Civ.App.—Amarillo 1952, writ ref'd n.r.e.).

For the reasons we have set out, we hold that the Joneses were charged with knowledge of the deed records pursuant to Article 5330, section 5. Therefore, under the after-acquired title doctrine, they took subject to Allen S. Starbuck's prior deeds and the mineral interest of appellees. The Joneses' first point is overruled.

Our disposition of the Joneses' first point obviates the necessity for discussion of their second point contesting any award of attorney's fees to appellees as the prevailing parties. Finding no error in the judgment of the trial court, we must, and do, affirm that judgment.